650 P.2d 487

**STATE of Arizona, Appellee,**

v.

**Norma LYCETT aka Garcia, Appellant.**

**No. 1 CA–CR 5106.**

Court of Appeals of Arizona, Division 1, Department B.

July 29, 1982.

Jessica Gifford, Asst. Attys. Gen., Phoenix, for appellee.

Smith & Feola, P.C. by Barry Becker, Dennis I. Wilenchik, Phoenix, for appellant.

## OPINION

JACOBSON, Presiding Judge.

The defendant appeals from her conviction of one count of conspiracy and one count of promoting, offering or granting participation in a pyramid scheme following a trial by jury. The imposition of sentence was suspended, and the defendant was placed on two years probation and was fined $240. The defendant was also required to reimburse Maricopa County in the amount of $240 as and for attorney's fees. She timely filed a notice of appeal and raises three issues for our consideration: (1) whether A.R.S. § 44–1731 is unconstitutionally vague and overbroad; (2) whether A.R.S. § 44–1731 is unlawful because it is a strict liability statute; (3) whether the trial court improperly admitted into evidence extrajudicial statements of various co-conspirators against the defendant. We affirm.

This case is a companion case to *State v. Hill,* 1 CA–CR 5168, Memorandum Decision issued this date. Defendants Hill and Lycett were charged with identical counts arising out of the same transaction and were tried jointly. The evidence at trial revealed that on February 22, 1980, Sandy Gantner, who testified under a grant of immunity, went to a meeting of the Business Men's Venture Club. Hill and Lycett were both present at that meeting. At the meeting, Jack Musgrave used a pyramid chart to explain how each person would pay $1,000 to put his name on the chart. Of that $1,000, $500 would go to the person directly above his name on the chart who recruited him to sign up, and $500 would go to the person at the top of the pyramid chart. Each person who had paid his $1,000 then would recruit two more people to sign up, and those two people would pay $500 to the person who recruited them and $500 to the person on the top line. Each person who paid his $1,000 would start his own

Robert K. Corbin, Atty. Gen. by William J. Schafer, III, Chief Counsel, Crim. Div.,

chart, the object being for each person's chart to be filled by recruiting others who would then in turn recruit others. Ultimately, if 128 people were recruited the initial investor would make $64,000. Musgrave also explained that of the $64,000, $500 would be paid to the recording secretary for taking care of the books and money. Musgrave told people at the meeting not to mail checks to the recording secretary because "it would be like mail fraud." The defendants Hill and Lycett were both present when Musgrave made the statement.

Hill stated that she came to Arizona from Kansas to get her sister, Lycett, involved. When the formal presentation was complete, the persons attending the meeting broke up into small groups, and at that time Hill explained the charts to people and indicated where their names would go on their charts and how many people they needed in order to hit their "pay line." Hill told Gantner that she had made a lot of money with the Business Men's Venture Club in Missouri and that the charts had worked well for her.

On February 29, 1980, another meeting of the Business Men's Venture Club was held at the Gantner home. Sandy Gantner testified that both defendant Lycett and Hill were present at that meeting and that Bill Musgrave, the brother of Jack Musgrave, made a presentation similar to the presentation at the meeting on February 22, 1980. Musgrave introduced Hill and Lycett saying that they would be the recording secretaries for the Business Men's Venture Club in Phoenix. Lycett gave people her phone number at that meeting and explained the charts to people after they had broken into small groups.

Sandy Gantner testified that she attended another meeting on March 4, 1980, at which both defendants were present. Alice and Bill Musgrave made presentations at that meeting. Alice Musgrave said that the pyramid scheme was "like committing adultery or running three [sic] red lights as long as nobody complained" there was nothing to worry about. At this meeting, both Hill

and Lycett explained the charts to other persons attending the meeting. Additionally, Gantner testified that Lycett collected money from participants at the meeting, and that she was assisted by defendant Hill.

Sandy Gantner testified that she held another meeting on March 7, 1980, at her home. Alice Musgrave called Gantner prior to that meeting and said she had found out that it was illegal and that she wanted to call the meeting off because the press might be there. The meeting proceeded nevertheless, and both Hill and Lycett were present. The defendants once again helped explain the charts to persons present at the meeting. It was Gantner's opinion that Hill was promoting the Business Men's Venture Club at that meeting.

Gerald Newhouse, an investigator for the Attorney General's office, testified that he also attended the meeting on March 7, 1980, in an undercover capacity. He tape recorded a major portion of the meeting, and the tape recording was transcribed. Both the tape recording and the transcription were introduced at trial over the defendant's objections. When Newhouse first arrived at the meeting, he heard Hill tell two women that they were not doing anything illegal and not to worry about the legality of the operation. Jack Musgrave made the presentation at this March 7 meeting, and described how much money could be made by the scheme, his personal financial experience with the plan and the financial rewards he experienced. He stated that Sara Hill could vouch for everything he said. He also said that he was putting his children on a chart and setting up a trust fund for them, and that he intended to "get on a chart" in Las Vegas. He told the group that the important thing was for them to get on a chart as soon as possible. He pointed out that the persons organizing the Business Men's Venture Club were his two brothers and Hill. Newhouse testified that during Musgrave's presentation, Hill stated encouraging things: that it was the greatest thing that had happened to her, that she made an investment for her children, and that she would like to invest in Las Vegas.

During this presentation, Musgrave, Hill and Lycett all mentioned that the investors were not to put their checks in the mail because it would be like mail fraud. Musgrave introduced Lycett as the recording secretary, and she told the group to call ahead when they had the cashier's check and make an appointment with her. After the meeting broke into small groups, Newhouse, who did not invest any money in the Business Men's Venture Club, received his own chart from a Mr. Garcia, who in turn got it from Lycett. Lycett told Garcia the names to fill out above Newhouse's on his chart, and those names were: J.C. Musgrave, D. Musgrave, S. Hill, B.J. Musgrave, N. Lycett, R. Garcia. Newhouse observed other charts that night with the names S. Hill and N. Lycett on them. Hill questioned Newhouse during the meeting about who his sponsor was and whether or not he was invited to be there. Hill also told Newhouse that the Business Men's Venture Club was a "very good thing and avery [sic] good way of making some money" and that he had a potential of making $64,000. Based upon their participation, in Newhouse's opinion, both Hill and Lycett were promoting the Business Men's Venture Club to make money for themselves.

Shortly after the March 7 meeting, Hill, Lycett and the Musgraves were arrested. All of the defendants, with the exception of Hill and Lycett pled guilty. However, prior to trial, the defendants filed a motion to dismiss on the grounds that the case was based on discriminatory enforcement, that the statute defining pyramid scheme was void for vagueness, and that the statute should be stricken because it was a strict liability statute. Those motions were denied by the trial court. Hill and Lycett also filed a *motion in limine* to preclude the admission of hearsay statements and acts by co-conspirators. This motion was denied by the trial court during trial.

Finally, the state called as an expert witness, Dr. Dennis L. Young, Associate Professor of Mathematics at Arizona State University, who testified that in order for the first 255 people on a pyramid chart to obtain $64,000, 32,512 investors would need to be recruited. For those 32,512 investors to earn their $64,000, more than 4 million investors would be required, and for the 4 million investors to make their $64,000, 532 million investors would have to be recruited, and for those 532 million investors to receive a $64,000 return, 68 billion investors would be necessary. Dr. Young testified that approximately 50 per cent of all investors would never receive their initial $1,000 back, and that slightly less than one per cent would ever make $64,000.

## CONSTITUTIONALITY OF A.R.S. § 44–1731

For her first argument on appeal, the defendant asserts that A.R.S. § 44–1731 is unconstitutionally vague and overbroad. A.R.S. § 44–1731 reads as follows:

A. It is illegal and prohibited for any person or his or its agent or employee to promote, offer or grant participation in a chain or pyramid distributor scheme.

B. In this article, a "chain distributor scheme" or a "pryamid distributor scheme" is a sales device whereby a person, upon condition that he make an investment, is granted a license or right to solicit or recruit for profit or economic gain one or more additional persons who are also granted such license or right upon condition of making an investment and may further perpetuate the chain of persons who are granted such license or right upon such condition.

C. In this article, "investment" means any acquisition, for a consideration other than personal services, of property, tangible or intangible, and includes without limitation franchises, business opportunities and services. It does not include sales demonstration equipment and materials furnished at cost for use in making sales and not for resale.

D. A limitation as to the number of persons who may participate, or the presence of additional conditions affecting eligibility for such license or right to recruit or solicit or the receipt of profits therefrom, does not change the identity of the

scheme as a chain or pyramid distributor scheme.

 In analyzing a claim of unconstitutionality for vagueness and overbreadth, this court has a duty to construe a statute in such a manner that it will be constitutional. *Schecter v. Killingsworth,* 93 Ariz. 273, 380 P.2d 136 (1963). There is a strong presumption supporting the constitutionality of statutes, and the party challenging the validity of the statute has the burden of establishing the invalidity of the statute beyond a reasonable doubt. *Rochlin v. State,* 112 Ariz. 171, 540 P.2d 643 (1975). Moreover, "the Legislature possesses broad discretion in defining criminal offenses, so long as the classification of an act is not totally arbitrary or capricious." *State v. Leeman,* 119 Ariz. 459, 462, 581 P.2d 693, 696 (1978). In *State ex rel. Purcell v. Superior Court,* 111 Ariz. 582, 535 P.2d 1299 (1975), the Arizona Supreme Court defined the difference between a claim of unconstitutional vagueness and unconstitutional overbreadth as follows:

> A statute is too vague when it fails to give fair notice of what it prohibits. It is overbroad when its language, given its normal meaning, is so broad that the sanctions may apply to conduct which the state is not entitled to regulate.

111 Ariz. at 584, 535 P.2d at 1301. The underlying principle for the requirement that statutes be sufficiently definite to give a person notice that his contemplated conduct is forbidden "is that no person should be required, at the risk of his liberty, to speculate as to the meaning of a criminal statute." *State v. Limpus,* 128 Ariz. 371, 375, 625 P.2d 960, 964 (App. 1981).

 The defendant's argument that the statute is unconstitutionally vague is based on the very nature of the investment in a pyramid scheme, that is, one who invests money in the scheme must encourage other people to join it or else lose his own money, and that therefore, the statute refers to both victims and perpetrators as a single class. She states that all who invest as victims exhibit an attempt to violate subsection A of the statute, and that therefore it is unclear what behavior is intended to be proscribed, the promoting and granting, or the investing. She also asserts that subsection C of the statute is incomprehensible because "acquisition" is not defined and is therefore vague.

The language of the statute is clear on its face that a pyramid scheme involves a person making an investment, who is then given the opportunity to find other people to make the same investment, who, in turn, are granted the same opportunity to get other people involved, all in the hope that each person will receive a profit by getting the other people involved. Under subsection A of § 44–1731, in order for a person to be criminally liable under the statute, a person must promote, offer or grant participation in a pyramid scheme. Even if it is true that most people who join the scheme would attempt to exercise their license to get others involved, the statute makes it clear that the state would have to prove beyond a reasonable doubt that a person charged with an offense under the statute did, in fact, encourage others to join, and thus proof of mere investing would not be enough to sustain a conviction under A.R.S. § 44–1731. We therefore hold that A.R.S. § 44–1731 is not void for vagueness in failing to distinguish between promoters and investors.

 Defendant's argument that the statute is also vague because it fails to define the word "acquisition" in subsection C of the statute, also fails. Subsection B of the statute defines the "pyramid scheme" as a "sales device whereby a person, upon condition that he make an investment" is granted a license to solicit others. Subsection C defines "investment" as "any acquisition, for a consideration other than personal services" of tangible or intangible property. In context, the term "acquisition" refers to the consideration that the investor parts with for the privilege of being allowed to participate in the scheme. We therefore reject the defendant's argument that the "acquisition" is the mere hope of the investor making $64,000.

We find the statute is not void for vagueness. Defendant next contends that subsection D is overbroad because it declares all pyramid schemes illegal despite any limitations as to the number of persons who may participate or the presence of conditions as to eligibility. She contends that it prescribes pyramid schemes "even among family members, social acquaintances, and without regard to the degree of sophistication of the participants."

■ In order to sustain a challenge on overbreadth grounds, a defendant must show that he or she is being punished for some protected expressive activity or is a member of the class whose innocent conduct is being persecuted.[1] *State ex rel. Purcell v. Superior Court, supra; State v. Schoner,* 121 Ariz. 528, 591 P.2d 1305 (App. 1979). The rationale behind the enactment of the comprehensive pyramid scheme statute is understandable when the nature of a pyramid scheme is understood. A pyramid scheme is made illegal by the legislature because, by its very nature, it's an inherent fraud in that all of the later investors in this scheme must lose their entire investment. A cursory review of the charts of the Business Men's Venture Club indicates that the number of participants on the chart must be constantly doubled in order for persons to recover their original investment.

■ As Professor Young testified, for the first 255 people on the pyramid chart to obtain the promised return of $64,000, 32,-512 investors would need to be recruited. For these 32,512 investors to get their return, an additional 4 million investors are required; then 532 million investors, and then 64 billion investors. It is clear that the number of individuals who would lose their money under such scheme becomes greater as the scheme is allowed to spread.

A.R.S. § 44–1731 serves a legitimate public interest by imposing criminal liability on those who would encourage other persons to join the scheme, because unless the promotors are stopped, they will enlarge the number of people who must ultimately lose their money in the scheme. The state is entitled to regulate such inherently fraudulent conduct, even among family members and social acquaintances and without regard to the degree of sophistication of the participants. Clearly the defendant's conduct fell within the parameters of the conduct prohibited by the statute.

■ Further A.R.S. § 44–1731 does not begin to encroach on any constitutionally protected activities. In this case, the speech and conduct proscribed by § 44–1731 which encourages others to join a pyramid scheme is what is specifically made illegal under the terms of the statute, and does not amount to constitutionally protected speech:

[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.

*Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 502, 69 S.Ct. 684, 691, 93 L.Ed. 834, 843–44 (1949).

■ Finally, the defendant contends that there is a denial of equal protection because there is no rational basis for the exception in A.R.S. § 44–1731(C)[2] for sales demonstration equipment and materials furnished at cost for use in making sales. We conclude, as the state points out, that there is a rational difference "between the legitimate business practice of putting up money to demonstrate a product in the hope that it will be purchased, and enticing people to

---

1. The defendant herein does not claim that she is being innocently ensnared by an overbroad statute. In a similar case, Division 2 of this court recently held that a defendant has no standing to challenge a statute on grounds of overbreadth, unless the legislation regulates the exercise of First Amendment rights. *State v.*

*Carruth, Hawkins and Brown,* 132 Ariz. 368, 645 P.2d 1282 (1982). Defendant's First Amendment argument is dealt with later in this opinion.

2. For a general discussion of pyramid plans, see Annot. 54 A.L.R.3d 217 (1973).

'invest' cash in exchange for the right to entice others into parting with their cash, with the inevitable end result that 50 percent of the participants will lose their cash outlay." We find no denial of equal protection.

## STRICT LIABILITY

◼ The defendant next asserts that we should find that A.R.S. § 44–1731 is void simply because it is a strict liability statute. The defendant concedes that the state has the power to enact criminal statutes that do not require a criminal intent, and the question here is whether § 44–1731 is the type of strict liability statute which may be enacted by the legislature. In *Morissette v. United States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), the United States Supreme Court held that strict liability statutes may be enacted to protect the public health, safety and welfare. A.R.S. § 44–1731 is a regulatory statute passed by the legislature in the exercise of its police powers designed to protect society from the automatic loss attributable to pyramid schemes. It is enacted to protect the public safety and welfare from the loss that must occur if pyramid schemes are initiated. In *Morissette,* the Supreme Court noted that strict liability statutes are becoming more prevalent in modern society, and that society has caused regulations which heighten the duty of care imposed upon individuals in particular activities, stating:

This has confronted the courts with a multitude of prosecutions, based on statutes or administrative regulations, for what have been aptly called "public welfare offenses." These cases do not fit neatly into any of such accepted classifications of common-law offenses, such as those against the state, the person, property, or public morals. Many of these offenses are not in the nature of positive aggressions or invasions, with which the common law so often dealt, but are in the nature of neglect where the law requires care, or inaction where it imposes a duty. Many violations of such regulations result in no direct or immediate injury to person or property but merely create the danger or probability of it which the law seeks to minimize. While such offenses do not threaten the security of the state in the manner of treason, they may be regarded as offenses against its authority, for their occurrence impairs the efficiency of controls deemed essential to the social order as presently constituted. In this respect, whatever the intent of the violator, the injury is the same, and the consequences are injurious or not according to fortuity. Hence, legislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element.

342 U.S. at 255–56, 72 S.Ct. at 246, 96 L.Ed. at 296–97. It is clear that the legislature enacted A.R.S. § 44–1731 to protect the public from the loss that must occur if pyramid schemes are initiated. Because such schemes are inherently fraudulent, the legislature defined them as *malum prohibitum,* and we hold that the legislature acted appropriately in so doing.

◼ The defendant also claims that the comments by R. Gerber to A.R.S. § 13–202(B) demonstrates that the legislature did not intend for the pyramid scheme statute to be a strict liability statute. A.R.S. § 13–202(B) provides:

If the statute defining an offense does not expressly prescribe a culpable mental state that is sufficient for commission of the offense, no culpable mental state is required for the commission of such offense, and the offense is one of strict liability unless the proscribed conduct necessarily involves a culpable mental state. If the offense is one of strict liability, proof of a culpable mental state will also suffice to establish criminal responsibility.

Gerber's comments on Subsection B as follows:

Subsection (B) apparently establishes some limitation on strict liability legislation so that an appropriate mental state will be judicially read into statutes which "necessarily involve" a culpable mental state. The Code's only clearly designated strict liability statutes are new A.R.S.

§ 13–1105 on felony-murder and new A.R.S. § 13–1603 prohibiting littering. R. Gerber, *Criminal Law of Arizona* 29 (1978). This comment to Section 13–202(B), refers only to those crimes contained in the new criminal code, A.R.S. §§ 13–101 to 4221, not to offenses defined in other parts of the Arizona Revised Statutes. Nothing in these comments to A.R.S. § 13–202(B) could be construed as a statement that the legislature did not intend A.R.S. § 44–1731 to be a strict liability statute. It is the legislative intent which is determinative of whether a criminal statute is *malum prohibitum* or *malum in se*. *State v. Burrow,* 13 Ariz.App. 130, 474 P.2d 849 (1970).

## ADMISSION OF CO–CONSPIRATORS' STATEMENTS

For her last argument on appeal, the defendant contends that the trial court erred in admitting the tape recordings and the transcript of the tape recording containing statements of the co-conspirators.

 Concerning the statements admitted in the trial which constitute extra judicial statements by co-conspirators, 17A A.R.S., Rules of Evidence, Rule 801(d)(2)(E), excludes from hearsay the statements made by a co-conspirator of a party "during the course and in furtherance of the conspiracy." It is further clear that while there must be sufficient independent proof of the conspiracy to render such statements admissible, the trial court may vary the order of proof and admit the declarations of co-conspirators subject to the subsequent production of the independent proof of the conspiracy. *State v. Ferrari,* 112 Ariz. 324, 541 P.2d 921 (1975); *State v. Speerschneider,* 25 Ariz.App. 340, 543 P.2d 461 (1975). 17A A.R.S., Rules of Evidence, Rule 104(a), provides that preliminary questions concerning the admissibility of evidence shall be determined by the court, and Rule 104(b) provides that the court may permit introduction of the evidence "subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition." The defendant asserts that the trial court should apply a preponderance of the evidence standard to the proof of the conspiracy before determining that the co-conspirators' acts and statements are admissible. However, the Arizona Supreme Court has most recently held that the record must reveal "sufficient reliable evidence of a conspiracy" for the declarations to be admissible. *State v. Baumann,* 125 Ariz. 404, 411, 610 P.2d 38, 45 (1980).

 We therefore must determine whether the state introduced "sufficient reliable evidence" of the conspiracy and the defendant's participation therein (independent of the statements of the co-conspirators) to make admissible the tape recordings and transcripts.

The evidence independent of the tape recording and the transcript indicates that the defendant Lycett gave people her phone number and explained charts to the members at the meeting of February 29, 1980. At the meeting on March 4, she collected money from people and filled in names on their charts. At the meeting on March 7, 1980, she showed Garcia how to fill out a chart for Newhouse, and that chart had her name on it as a person who would receive money. She introduced herself at the meeting and told all persons there not to put their checks in the mail in order to avoid mail fraud charges, and she also told people to spell names correctly on the cashier's checks. This evidence of defendant's actions alone is sufficient to establish the existence of a conspiracy and her participation in it. Moreover, she contends only that the tape recording and the transcript of it were inadmissible. Therefore, the testimony of Sandy Gantner and of Newhouse concerning the explanations of the pyramid chart and the occurrences at the meetings establishes the existence of a conspiracy beyond a reasonable doubt.

 The defendant also argues that the statements were improperly admitted without a cautionary instruction to the jury that they were "conditionally admitted." First, there was no request for such an instruction, and therefore the claim of error was waived for purposes of appeal. Moreover, the defendant has cited no Arizona authority for the proposition that the trial

**194**

court must preliminarily instruct the jury to disregard statements of the co-conspirators until the jury is satisfied that the state has proven the existence of a conspiracy by independent evidence. In *United States v. James,* 590 F.2d 575 (5th Cir. 1979), the court, interpreting Rule 104 of the Federal Rules of Evidence, concluded that the trial court alone had the duty to determine the admissibility of co-conspirator's statements. The court there specifically stated, "[t]he jury is to play no role in determining the admissibility of the statements." 590 F.2d at 580. To that end, the court held that the trial court should whenever practicable require that the conspiracy and the connection of the defendant with the conspiracy be established by independent proof before admitting declarations of a co-conspirator. In cases where it is not reasonably practicable to require such a showing, the Fifth Circuit noted that the trial court may admit the co-conspirator's statement subject to it being connected by the prosecution. Thus, the question of whether sufficient independent proof of the conspiracy had been presented, and the order of proof were questions for the trial court and not for the jury.

We adopt this rule for Arizona. 17A A.R.S., Rules of Evidence, Rule 104(a), provides that preliminary questions concerning the admissibility of evidence shall be determined by the court. We hold that this rule requires the trial court to determine whether sufficient independent proof of the conspiracy and the defendant's connection therewith has been shown in order to render the co-conspirators' statements admissible. In the instant case, we have already concluded that the state presented sufficient independent proof of the conspiracy and the defendant's connection therewith in order to render the tape recording and the transcript thereof admissible. We conclude therefore that the tape recording and the transcript were properly admitted into evidence.

For the foregoing reasons, the judgment and sentence are affirmed.

GRANT, J., and RICHARD M. DAVIS, J. Pro Tem., concur.