908 P.2d 12

Jack BIRD and Charles Lofton Hollamon, Plaintiffs–Appellees,

and

The Honorable Carl Colle, Justice of the Peace, Pro Tem., Campe Verde Precinct, Defendant,

v.

STATE of Arizona, Real Party in Interest–Appellant.

No. 1 CA–CV 94–0010.

Court of Appeals of Arizona, Division 1, Department B.

Aug. 22, 1995.

Review Denied Dec. 19, 1995.

200

Lawrence William Katz, Lawyer, Ltd. by Lawrence William Katz, Prescott, for plaintiffs-appellees.

Charles R. Hastings, Yavapai County Attorney by Arthur T. Markham, Deputy County Attorney, Prescott, and Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, and Randall M. Howe, Assistant Attorney General, Phoenix, for real party in interest-appellant.

## OPINION

GRANT, Judge.

This appeal requires us to decide whether the Arizona statute forbidding wagering on the outcome of an election runs afoul of constitutional freedom-of-speech protections. We hold that the statute, Ariz.Rev.Stat.Ann. ("A.R.S.") section 16–1015, is not unconstitutionally vague or overbroad. We reverse the superior court's ruling to the contrary.

### FACTS AND PROCEDURAL HISTORY

On March 23, 1993, the state charged the plaintiffs/appellees Jack Bird and Charles Lofton "Loft" Hollamon with violating the statute prohibiting betting on the outcome of an election:

§ 16–1015. Election wagers; classification

A person who, before or during an election provided by law, knowingly makes, offers or accepts a bet or wager, or takes a share or interest in, or in any manner becomes a party to the bet or wager, or provides or agrees to provide money to be used by another in making the bet or wager, upon any contingency whatever arising out of such election, is guilty of a class 2 misdemeanor.

The charges were made after the following announcement appeared in the *Verde Independent:*

**PUBLIC ANNOUNCEMENT**

Jack Bird Challenges Loft Hollamon with a bet. Jack says he will wipe us out at the voting booth. Jack will pay $100 for each man in our group who gets more votes than his councilmen. Loft took him up on

it, and will also pay $100 for each of his men that get less votes than Jack Bird's councilmen.

**Jack Bird's councilmen are:**

Tap Parsons
Pat Kaminsky
Marvin Reynolds
Woody Diehl
Jerry Taylor

**Loft Hollamon's potential councilmen are:**

Loft Hollamon
Norma Wolford
William Yates
Gary Thompson
Raymond Coon

Both agree to this challenge on December 12, 1992 and will be paid within twenty-four hours after the final counting of the votes of the February 2nd election.

/x/ Jack Bird
Jack Bird

/x/ Loft Hollamon
Loft Hollamon

**NOTE:** It could cost $500 to determine who has a vested interest in this election. Jack Bird is our local real estate agent and Loft Hollamon is our well driller. I have always stuck by Camp Verde, now it is your turn to stick by me.

Loft Hollamon

Bird and Hollamon moved to dismiss the charges, arguing that section 16–1015 is unconstitutionally vague and overbroad. The Camp Verde Justice Court, the Honorable Carl Colle, Justice of the Peace *pro tem.*, denied the motion. Bird and Hollamon then filed a petition for special action in the Yavapai County Superior Court, seeking an order of that court requiring the charges be dismissed.

In their petition, Bird and Hollamon argued that the statute was vague and overbroad, and that they were the victims of selective prosecution. They based the latter claim on the following facts. The September 22, 1993, issue of the *Prescott Sun* carried on its front page a story about the reelection of Prescott Mayor, Daiton Rutkowski. Next to the story was a photograph bearing this caption: "City of Prescott Public Information

Officer Greg Fister, left, pays Mayor Daiton Rutkowski $1. The two bet earlier in the day on the election. Rutkowski won." The Prescott City Attorney, John R. Moffitt, referred the matter to the Coconino County Attorney, Terrence C. Hance, for possible prosecution. The Coconino County Attorney refused to prosecute. In a letter to the City Attorney, then Chief Deputy Coconino County Attorney Fred Newton wrote:

I have reviewed all the material provided and A.R.S. § 16–1015. It is my conclusion that no criminal charges be filed. There does not appear to be any criminal intent, and the costs of prosecution would far outweigh any public policy reason for filing charges.

Clearly, our decision to decline prosecution should not be considered as an endorsement for betting on elections. If the amount of the wager had been substantially more, then the interests of justice would require prosecution, as the statute prohibiting gambling on public elections has substantial merit.

At the hearing on the petition for special action, the plaintiffs argued that the statute should have been drawn more narrowly; that it could be improperly used to prosecute supposedly harmless bets, such as two people whose bet required the loser to push the other around the courthouse in a wheelbarrow. The superior court accepted jurisdiction and granted the requested relief. From the bench the judge stated his reasons for granting relief. He rejected the plaintiffs' contention about selective prosecution, and acknowledged that the "legislature has a legitimate interest in maintaining the integrity of free elections in this country and attempting to see to it that the elections are not in any way tainted...." He then stated:

So you understand clearly what I determined that I'm here to decide, counsel, I'm here to decide whether A.R.S. 16–1015 is constitutional, whether that statute violates perhaps Article II Section 6 of the Arizona Constitution, which it may or may not do; ultimately, though, whether it violates the First Amendment to the United States Constitution as applied to this case and the

14th Amendment, and that's what I'm here to decide.

One in reading the statute, which is relatively short, could infer, from one clause "or provides or agrees to provide money to be used by another in making the bet or wager" that the statute is designed to prevent serious gambling or money being exchanged by which an election might be perhaps influenced. When we're talking about the First Amendment to the United States Constitution, you better not sit around and infer. . . .

Here we have a one-sentence statute, and it doesn't take a great deal of imagination to come up with dozens and dozens of ways that that statute can be violated in the favorite national pastime, the process of engaging in the favorite national pastime of citizens of the United States of America, namely politics. I'll betcha the bond election passes. I'll betcha it doesn't. You know. I'll come over and thin out your iris bulbs if Charlie wins the election. For goodness sake, it goes on and on, over-the-back-fence kinds of exchanges between people having nothing whatsoever to do with the election, indeed people who are not even registered voters.

This is the sort of thing that could be prosecuted in the juvenile court if a couple of second grade kids got together and bet on who is going to win the presidential election a couple years down the road. The examples could be—are legion and could become—and could just lead to silliness. But when you're talking about the First Amendment of the United States Constitution, you're talking about freedom of speech in a political arena such as this country is, you can't have statutes that so interfere with the free exchange of ideas on the books that they stifle the political process.

This statute is patently unconstitutional, and the relief requested in the petition for special action is granted.

The superior court issued a minute entry stating:

The Court states that it is not persuaded by the fact that a Prosecutor out of Coconino County chose not to prosecute the Mayor of Prescott for violation of A.R.S. Section 16–1015, that the Court is not here to decide the facts of the case. The Court acknowledges that the Legislature has an interest in maintaining integrity of free elections in this country, that the Court is here to decide whether A.R.S. Section 16–1015 is constitutional, and whether the statutes [sic] violated Article 2, Section 6 of the Arizona Constitution.

IT IS THEREFORE ORDERED that the relief requested in the Special Action is granted.

On December 13, 1993, the state filed a premature notice of appeal.[1] The court entered its formal order on January 18, 1994, stating:

IT IS HEREBY ORDERED granting the relief requested in the Special Action, to wit: A.R.S. § 16–1015 is unconstitutional; therefore, the charges alleging a violation of A.R.S. § 16–1015 are dismissed.

This final judgment having been entered, this court has jurisdiction pursuant to A.R.S. section 12–2101(B) and Rule 8(a), Ariz.R.P.Special Actions.

## DISCUSSION

The plaintiffs argue that section 16–1015 is unconstitutionally vague and overbroad. Embedded in both claims is the argument that the statute infringes on their constitutionally-protected free speech rights,[2] al-

---

1. The notice was premature because no formally-appealable order had yet been entered. *See* Ariz. R.Civ.P. 58(a).

2. In their brief, the plaintiffs cite only Arizona's constitutional provision: "Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right." Ariz. Const. art. 2, § 6. The First Amendment to the United States Constitution provides in part: "Congress shall make no law ... abridging the freedom of speech. . . ." For this opinion, we decide based only on the Arizona Constitutional provision as that is all that is cited by plaintiffs. As to the Arizona Constitution and interpretation of this statute, this is a case of first impression. However, because many of the cases we cite deal with the First Amendment, we will refer to both the federal and state constitutional rights collectively as the "First Amendment."

though their vagueness challenge also presents a non-constitutional argument.[3]

## I. VAGUENESS AND OVERBREADTH

The United States Supreme Court has reiterated the right of individuals to engage in "the unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Brown v. Hartlage,* 456 U.S. 45, 53, 102 S.Ct. 1523, 1529, 71 L.Ed.2d 732 (1982). The plaintiffs challenge A.R.S. section 16–1015 on the ground that it infringes on their First Amendment rights to publicize a local election.

The plaintiffs assert the statute is vague and overbroad, thereby having a "chilling effect" on free speech. Our supreme court has set forth the following distinction between vagueness and overbreadth:

> A statute is too vague when it fails to give fair notice of what it prohibits. It is overbroad when its language, given its normal meaning, is so broad that the sanctions may apply to conduct which the state is not entitled to regulate.

*State ex rel. Purcell v. Superior Court,* 111 Ariz. 582, 584, 535 P.2d 1299, 1301 (1975). *See State v. Lycett,* 133 Ariz. 185, 190, 650 P.2d 487, 492 (App.1982).

The presumption in favor of the constitutionality of a statute requires the challenging party to establish beyond a reasonable doubt that the statute violates some provision of the constitution. *Rochlin v. State,* 112 Ariz. 171, 174, 540 P.2d 643, 646 (1975); *Lycett,* 133 Ariz. at 190, 650 P.2d at 492. A statute is unconstitutionally vague

> if it fails to give "a person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" or if it allows for arbitrary and discriminatory enforcement by failing to provide an objective standard for those who are charged with enforcing or applying the law.

*In re Maricopa County Juvenile Action No. JS–5209 and No. JS–4963,* 143 Ariz. 178, 183,

692 P.2d 1027, 1032 (App.1984) (quoting *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). Stated another way, a statute is unconstitutional for vagueness if it fails to sufficiently inform "those who are subject to it what conduct on their part will render them liable to its penalties." *State v. McNair,* 141 Ariz. 475, 483, 687 P.2d 1230, 1238 (1984) (quoting *Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127–28, 70 L.Ed. 322 (1926)). Thus, "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process." *Id.* When the literal scope of a criminal statute is capable of reaching constitutionally-protected expression, then "the vagueness doctrine demands a greater degree of specificity." *State v. Steiger,* 162 Ariz. 138, 142, 781 P.2d 616, 620 (App.1989), citing *Smith v. Goguen,* 415 U.S. 566, 573, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605 (1974). On the other hand, "[d]ue process requires neither perfect notice, absolute precision nor impossible standards. It requires only that the language of a statute convey a definite warning of the proscribed conduct." *Fuenning v. Superior Court,* 139 Ariz. 590, 598, 680 P.2d 121, 129 (1983).

Although similar, an overbreadth challenge is not the same as a vagueness challenge. *Maricopa County Juvenile Action No. JS–5209 and No. JS–4963,* 143 Ariz. at 183, 692 P.2d at 1032. "The evil to be avoided by overbroad statutes is that the net may be so large that it snares the innocent as well as the guilty." *Id.,* 143 Ariz. at 186, 692 P.2d at 1035. A statute that infringes on activities that are constitutionally-protected is overbroad. *See Lycett,* 133 Ariz. at 191, 650 P.2d at 493.

### A. Facial Vagueness

We do not find A.R.S. section 16–1015 to be vague on its face. The statute clearly sets forth that which is prohibited: knowing-

---

**3.** The state seems to argue in its opening brief that the judgment does not comply with Rule 6, Ariz.R.P.Special Actions, because the grounds of the decision are supposedly not stated in the judgment. We will not base our decision on this argument: the grounds for the court's decision are apparent in the record.

ly wagering, offering to wager, accepting a wager, participating in a wager, or providing the money for a wager that depends on the outcome of an election, if done before or during an election. The words are clear and understandable by people of ordinary intelligence. This specific language both gives citizens notice of the prohibited conduct and gives law enforcement officials guidelines for enforcement. *See State v. Terrell,* 168 Ariz. 112, 113, 811 P.2d 364, 365 (App.1991).

■ Because of the statute's specificity, there is no inherent danger of arbitrary and discriminatory enforcement. Any so-called selective enforcement between the state's decision to prosecute the plaintiffs and its decision not to prosecute the mayor of Prescott does not originate in the wording of the statute, but rather apparently on the differing circumstances.[4] Absent a violation of due process, the prosecutor has broad discretion in deciding whether to file charges against one accused of a crime. *E.g., State v. Tsosie,* 171 Ariz. 683, 685, 832 P.2d 700, 702 (App.1992).

## B. Freedom of Speech Implications

### 1. *Expressive conduct*

■ The plaintiffs contend that A.R.S. section 16–1015 unconstitutionally encroaches on their First Amendment rights. While the First Amendment literally forbids the abridgment only of "speech," the Supreme Court has "long recognized that its protection does not end at the spoken or written word," but can encompass expressive conduct. *Texas v. Johnson,* 491 U.S. 397, 404, 109 S.Ct. 2533, 2538–39, 105 L.Ed.2d 342 (1989). The Supreme Court recognizes that conduct may be " 'sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amend-

ments.' " *Id.* (quoting *Spence v. Washington,* 418 U.S. 405, 409, 94 S.Ct. 2727, 2729–30, 41 L.Ed.2d 842 (1974)).

The plaintiffs contend that their bet constituted protected expressive conduct because they did it to publicize the local election.[5] The Supreme Court has stated: "We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *United States v. O'Brien,* 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968). It has given the following test to determine whether conduct should be protected as speech:

> In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether "[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it."

*Johnson,* 491 U.S. at 404, 109 S.Ct. at 2539 (quoting *Spence,* 418 U.S. at 410–11, 94 S.Ct. at 2730–31). We do not believe that the wager involved here meets this test. The plaintiffs assert that their bet was intended to raise voter interest in the election. This is not a "particularized" message, nor is there a great likelihood that the "message would be understood by those who viewed it." *Compare Spence,* 418 U.S. at 410–11, 94 S.Ct. at 2730 (flying American flag upside-down with peace symbol attached intended to proclaim that America stood for peace), *and Johnson,* 491 U.S. at 406, 109 S.Ct. at 2540–41 (burning American flag in protest demonstration while others chanted slogan was "overtly political" and its communicative nature was "both intentional and overwhelmingly apparent") *with Young v. New York City Transit*

4. On appeal the plaintiffs have abandoned their arguments, raised in their petition for special action, that the alleged selective enforcement violated equal protection. *See generally Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

5. The only support for the plaintiffs' assertion that their bet was intended to be political speech comes from the words of their attorney. In the petition for special action the attorney stated: "The alleged wager at issue here was intended as

a form of constitutionally protected political speech designed to raise voter interest in a local recall election." He repeats this assertion in the answering brief. The petition for special action is not verified, and there is no other evidence to support the assertion. We will nevertheless accept the assertion as true because, even if it is true, the statute remains constitutional. We also note that the state has not challenged the truth of the assertion.

*Auth.,* 903 F.2d 146, 153 (2d Cir.1990) *cert. denied,* 498 U.S. 984, 111 S.Ct. 516, 112 L.Ed.2d 528 (Nov. 26, 1990) (no particularized message inherent in panhandling; unlikely to be understood as such).

 Even accepting the plaintiffs' assertion that their bet constituted speech, this does not automatically accord them First Amendment protection. In *O'Brien,* the Supreme Court faced the issue of whether the defendant's action in burning his draft registration card during an anti-war demonstration constituted speech protected by the First Amendment. It stated:

> [E]ven on the assumption that the alleged communicative element in O'Brien's conduct is sufficient to bring into play the First Amendment, it does not necessarily follow that the destruction of a registration certificate is constitutionally protected activity. This Court has held that when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms. To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong.

*O'Brien,* 391 U.S. at 376–77, 88 S.Ct. at 1678–79 (footnotes omitted). While the First Amendment protects expressive conduct, as well as the written or spoken word, the government is freer to regulate the former. *Johnson,* 491 U.S. at 406, 109 S.Ct. at 2540–41. However,

> [the government] may not ... proscribe particular conduct *because* it has expressive elements. "... A law directed at the communicative nature of conduct must, like a law directed at speech itself, be justified by the substantial showing of need that the First Amendment requires." *Community for Creative Non–Violence v. Watt,* 227 U.S.App.D.C. 19, 55–56, 703 F.2d 586, 622–623 (1983) (Scalia, J., dissenting) (emphasis in original), *rev'd sub nom. Clark v. Community for Creative Non– Violence,* [468 U.S. 288, 104 S.Ct. 3065, 82

L.Ed.2d 221 (1984) ] *supra.* It is, in short, not simply the verbal or nonverbal nature of the expression, but the governmental interest at stake, that helps to determine whether a restriction on that expression is valid.

Thus, although we have recognized that where " 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms," *O'Brien, supra,* at 376, 88 S.Ct., at 1678, we have limited the applicability of *O'Brien* 's relatively lenient standard to those cases in which "the governmental interest is unrelated to the suppression of free expression." *Id.,* at 377, 88 S.Ct., at 1679; *see also Spence, supra,* at 414, n. 8, 94 S.Ct., at 2732, n. 8. In stating, moreover, that *O'Brien* 's test "in the last analysis is little, if any, different from the standard applied to time, place, or manner restrictions," *Clark, supra,* at 298, 104 S.Ct., at 3071, we have highlighted the requirement that the governmental interest in question be unconnected to expression in order to come under *O'Brien* 's less demanding rule.

*Id.* Section 16–1015 is not directed at the communicative aspect of the plaintiffs' conduct. Assuming that the plaintiffs made the bet, the statute seeks to punish them for that conduct, not for publicizing the bet by placing the announcement in the newspaper. *Compare Johnson,* 491 U.S. at 397, 109 S.Ct. at 2535–36 (statute prohibiting desecration of venerated object infringed on defendant's freedom of expression) *with O'Brien,* 391 U.S. 367, 88 S.Ct. 1673 (statute prohibiting destruction of draft registration card did not violate First Amendment even though defendant burned card as part of political protest). Thus, any impact on First Amendment rights is only incidental.

The Supreme Court has expressed the following test for the validity of a statute with an incidental effect on First Amendment rights:

> [W]e think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Govern-

ment; *if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.*

*O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679. We hold that A.R.S. section 16–1015 meets this test.

■ The government has the constitutional power to regulate or prohibit gambling in general, *see State v. Gambling Equipment,* 45 Ariz. 112, 114, 40 P.2d 746, 747 (1935) (it is within the police power of the state to prohibit gambling), and in particular to prevent gambling on elections. Both the plaintiffs and the superior court conceded this. Both also concede that A.R.S. section 16–1015 "furthers an important or substantial governmental interest": maintaining the integrity of public elections.

■ As we have already mentioned, the interest furthered by A.R.S. section 16–1015 is unrelated to the suppression of free expression. The statute bans the act of making a bet; it does not regulate or prohibit any act the plaintiffs might have undertaken to publicize the bet. The fact that the plaintiffs had to speak in order to accomplish the creation of the bet does not make those words protected speech. "[W]ords spoken with the intent to bring about the commission of a [criminal] act ... are not protected speech." *State v. Crisp,* 175 Ariz. 281, 283, 855 P.2d 795, 797 (App.1993).

The restriction on free speech imposed by A.R.S. section 16–1015, if there is any, is minimal, and is certainly no greater than is essential to the furtherance of the substantial government interest. The statute prevents the betting; it does not prevent the plaintiffs from undertaking publicity of the election. All the statute did was prohibit them from knowingly making the underlying bet.

■ Section 16–1015 does not directly impinge upon First Amendment values. In their petition for special action, the plaintiffs asserted: "They are being prosecuted not for betting on an election, but for publicizing that fact in the newspaper." While the state might choose to use the newspaper announcement as *evidence* of the crime (*cf. Wisconsin v. Mitchell,* 508 U.S. 476, 489, 113 S.Ct. 2194, 2201, 124 L.Ed.2d 436 (1993)) ("The First Amendment ... does not prohibit the evidentiary use of speech to establish the elements of a crime ..."), it *could not* obtain a conviction simply on that evidence. To satisfy the elements of the crime, the jury would have to find that the defendants actually made the bet mentioned in the announcement. The plaintiffs are free to publicize the election by placing a political announcement in the newspaper: they can even place an announcement proclaiming that they have undertaken a bet without fear of violating the statute. What they cannot do is actually make the bet. To imbue the bet itself with First Amendment protection in these circumstances would be to open a Pandora's Box: a defendant in a drug-sale prosecution could claim he purchased the drugs to publicize lax drug laws; or—to use an example the state argued to the superior court—a defendant could defend a battery charge on the grounds that he slugged the victim only to urge him to vote for the defendant's favored candidate. Clearly, these actions—whatever subjective element of communication might be present in them—can be regulated and prohibited by the legislature without running afoul of the First Amendment.

This distinction is demonstrated by *Johnson* and *Spence*. Spence was convicted for violating a statute prohibiting the improper display of an American flag after he hung a flag upside down, with a peace signed taped on it, from his apartment window. *Spence,* 418 U.S. at 406, 94 S.Ct. at 2728. He testified he did so because he wanted to proclaim that the United States stood for peace, not violence. (He hung his symbol shortly after the Kent State massacre and the invasion of Cambodia during the Vietnam War). *Id.* at 408, 94 S.Ct. at 2729. The Court recognized that it was "confronted then with a case of prosecution for the expression of an idea through activity." *Id.* at 411, 94 S.Ct. at 2730. The Court emphasized that the defendant owned the flag and displayed it on private property, and stated: "We have no

doubt that the State or National Governments constitutionally may forbid anyone from mishandling in any manner a flag *that is public property.*" *Id.* at 409, 94 S.Ct. at 2729 (emphasis added). Thus, the government can incidentally regulate conduct that is undoubtedly political speech if its regulation is directed toward an evil different than the speech itself.

Johnson was convicted under a Texas law prohibiting the desecration of venerated objects after he burned an American flag in a political demonstration contemporaneous with the Republican National Convention in Dallas, when Ronald Reagan was nominated for reelection as President. *Johnson,* 491 U.S. at 399, 109 S.Ct. at 2536–37. Johnson received the flag from a fellow demonstrator, who had taken it from a business along the route of the protesters' march. Johnson was convicted of "intentionally or knowingly desecrat[ing] ... a state or national flag," which meant to "deface, damage, or otherwise physically mistreat in a way that the actor knows will seriously offend one or more persons likely to observe or discover his action." *Id.* at 400, 109 S.Ct. at 2537. A major factor demonstrating that Johnson was prosecuted for his expression was that the bare action at the heart of the offense—burning the American flag—is the "preferred means of disposing of a flag 'when it is in such condition that it is no longer a fitting emblem for display.'" *Id.* at 411, 109 S.Ct. at 2543, (citing 36 U.S.C. § 176(k)). The Texas statute thus subjected him to prosecution for the "expression of an idea through activity." *Id.* at 410, 109 S.Ct. at 2543, (quoting *Spence,* 418 U.S. at 411, 94 S.Ct. at 2730–31). That element simply is not present with a bet under A.R.S. section 16–1015.

The plaintiffs further argue that "[o]n its face, A.R.S. § 16–1015 is so broad that the sanctions may apply to conduct which the State is not entitled to regulate." In arguing the statute is too broad, they posit the following:

Private bets between citizens regarding the outcome of an election do not implicate this interest [in preserving the integrity of elections], particularly when these bets involve nothing more than bragging rights or nominal amounts of money. The State's interest could be adequately served by the imposition of dollar amounts that delineate between those bets that raise an actual threat to the electoral process and those that do not. The State's interest could also be served by specifically excluding those involved in the election, in any capacity, from any betting activity whatsoever.

That is not what the statute does. Instead, it sweeps within its prohibitions that which may not be punished under the First Amendment. *Grayned v. City of Rockford,* 408 U.S. 104, 111, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222, 231 (1972). Given the availability of less intrusive means of achieving the purported goal raised by this legislation, and the chilling effect created by its broad sweep, A.R.S. § 16–1015 is patently unconstitutional.

Examples cited by the plaintiffs and the superior court include such "over-the-back-fence exchanges" as: a bet among second graders as to who will win the presidential election; a bet under which the losing bettor would have to wheel the winner around the courthouse in a wheelbarrow or thin out the winner's iris bulbs; or even a bet totally lacking consideration ("I'll betcha the bond election passes. I'll betcha it doesn't." [6]) This argument is grounded upon the assertion that only those bets that might affect the results of an election are fair game for legislative regulation. What this argument fails to recognize is that those activities are not protected. The state through its police power may prohibit gambling. *Gambling Equip-*

---

6. Although we are not called upon to decide the question, it does not appear to us that a so-called "bet" that lacks consideration would fall within the statute. The statute prohibits betting. The usual definition of a bet includes consideration: as a consequence of losing the bet, the loser must provide the winner with something, be it cash, be it services, or whatever. "Bet" has been defined as: "to pledge (something) as a forfeit if one's forecast of a future event is wrong, usually in return for a similar pledge by another if the forecast is right." RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 142 (1981). *See also* BLACK'S LAW DICTIONARY 146 (5th ed. 1979). Thus, the common phrase "I bet you that ..." is not implicated unless accompanied by some consequence of value.

**208**

*ment,* 45 Ariz. at 114, 40 P.2d at 747. The legislature has determined that it is proper to prohibit gambling on elections to maintain the integrity of the electoral process. The legislature has the right to determine which actions threaten that interest: the function of the courts is not to question the wisdom of legislation. *Rochlin,* 112 Ariz. at 174, 540 P.2d at 646; *Knapp v. Miller,* 165 Ariz. 527, 530, 799 P.2d 868, 871 (App.1990). We cannot invalidate a statute as overbroad unless it infringes on constitutionally-protected rights, and the plaintiffs have failed to demonstrate that A.R.S. section 16–1015 does that.

### CONCLUSION

Section 16–1015 broadly bans gambling on elections by prohibiting the offering, making, or accepting of a bet on the outcome of a legal election before or during such election. In so doing the statute does not infringe on free speech rights. We hold A.R.S. section 16–1015 is neither vague nor overbroad under the Arizona constitution. The superior court erred in declaring it unconstitutional.

The judgment is reversed.

KLEINSCHMIDT, P.J., and LANKFORD, J., concur.