808 P.2d 314

**STATE of Arizona, Appellee,**

v.

**Laure TAYLOR, Appellant.**

**No. 1 CA-CR 88-927.**

Court of Appeals of Arizona, Division 1, Department D.

Nov. 6, 1990.

**430**

of a sex show theatre, perform sexual acts upon each other for the gratification of customers who pay to watch? That is the central question of this case. Defendant claims on appeal that, because the acts were in the nature of theatrical performance, the state was obliged to prove obscenity to establish that they lacked protection of the First Amendment. The state responds that, whatever their expressive content, these were acts of prostitution as Arizona defines that crime and that no proof of obscenity was required.

## FACTS

The Ellwest Stereo Theatre in Phoenix, Arizona, is described by defendant's counsel as a place that "caters to the sexual fantasies of the desperate." The case against defendant was compiled by undercover police officers of the City of Phoenix who visited the Ellwest on six occasions and paid to watch performances by defendant Taylor and several codefendants.

The Ellwest offered film booths with graphically sexual movies. It also offered an arena where "dancers" displayed and fondled their vaginas and breasts. Customers were told, however, that the "nastiest" shows could be purchased in Booth 14. This case concerns only conduct in Booth 14.

Booth 14 was a closet-sized space, whose prominent features were a clear glass window, a telephone, a trash can for used tissues, one coin slot for tokens, and a larger slot for bills. Through the window, three feet above ground, was a platform made up as a bed. There a nude Ellwest employee lay, feet forward, two feet from the customer, and advised by phone that she would perform for a tip of twenty dollars, passed through the larger slot. The customer could engage a second woman in the performance for another twenty dollars or, for twenty dollars more, a third. The show continued as long as the customer kept the bed-chamber illuminated by feeding the coin slot with twenty-five cent tokens. Four tokens lit the room for thirty seconds.

Robert K. Corbin, Atty. Gen. by Jessica G. Funkhouser, Chief Counsel, Criminal Div., and Diane M. Ramsey, Asst. Atty. Gen., Phoenix, for appellee.

Dean W. Trebesch, Maricopa County Public Defender by James H. Kemper, Deputy Public Defender, Phoenix, for appellant.

## OPINION

FIDEL, Judge.

May the state secure prostitution convictions and avoid the burden of proving obscenity against women who, in the setting

The window in Booth 14 permitted each side to view the other, and customers were asked to expose their penises and masturbate to show that they were not police. Each officer made excuses, however, and the performers did not insist.

Officers saw defendant perform twice in Booth 14, each time with another woman. Each time, the performers fondled and licked each others' breasts and masturbated. One performer also squeezed milk from her breasts. Officers who watched other performances testified that women other than defendant fondled and licked each other vaginally as well.

The state introduced evidence that defendant managed the Ellwest in addition to performing in its shows.

Defendant was tried before a court sitting without a jury and convicted of four prostitution-related crimes. Based on her acts in Booth 14, defendant was convicted of one count of prostitution, a class 1 misdemeanor.[1] As a manager of the Ellwest, defendant was also convicted of one count of operating or maintaining a house of prostitution[2] and two counts of pandering,[3] all class. 5 felonies. The trial court suspended sentence on all counts and placed defendant on probation for three years.

## PROSTITUTION OR THEATRE

 Arizona defines "prostitution" as "engaging in or agreeing or offering to engage in sexual conduct with another person under a fee arrangement *with that person or any other person.*" A.R.S. § 13–3211(5) (1989) (emphasis added). "Sexual conduct" is defined as "sexual contact, sexual intercourse, oral sexual contact or sadomasochistic abuse." A.R.S.

§ 13–3211(8) (1989). "Sexual contact" is defined as "any direct or indirect fondling or manipulating of any part of the genitals, anus or female breasts." A.R.S. § 13–3211(9) (1989).

There is no doubt that defendant engaged in sexual contact in Booth 14—the fondling of another woman's breasts—under a fee arrangement with the detectives. This conduct, if unprotected by the First Amendment, constituted prostitution as defined in Arizona law. Had a customer paid to watch defendant and another woman engage in identical conduct in a private motel room, the application of the prostitution statute would be clear. A.R.S. § 13–3211(5) does not require sexual contact *with* the customer; it was written sufficiently broadly to encompass a sexual transaction for a customer who engages only as voyeur.

The defendant, however, emphasizes theatrical freedom of expression and argues that, to prove her conduct unprotected by the First Amendment, the state must first prove it obscene.[4] Defendant acknowledges that the law may place some boundary on erotic performance. Yet she argues that proof of obscenity is the constitutionally indispensable route to establish that a sexually explicit *theatrical* performance has exceeded First Amendment bounds.

## ANALYSIS

Analysis begins with *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), where the Supreme Court rejected a draft card burner's claim that the First Amendment protected his communicative act:

> costs, supervising activities or work schedules, and directing or furthering the aims of the enterprise."

**3.** "Pandering" is defined and classified in A.R.S. § 13–3209 (1989), which is quoted and discussed *infra.*

**4.** The state did not charge the defendant with violation of Arizona's obscenity statutes, A.R.S. §§ 13–3501 to 3512 (1989). This prosecution, therefore, does not rely on a statute that on its face prohibits certain forms of speech.

**1.** A.R.S. § 13–3214(A) (1989) provides, "A person who knowingly engages in prostitution is guilty of a class 1 misdemeanor."

**2.** A.R.S. § 13–3208(B) (1989) provides, "A person who knowingly operates or maintains a house of prostitution or prostitution enterprise is guilty of a class 5 felony."
 A.R.S. § 13–3211(3) (1989) provides, "'Operate and maintain' means to organize, design, perpetuate or control. Operate and maintain includes providing financial support by paying utilities, rent, maintenance costs or advertising

We cannot accept the view that an apparently limitless variety of conduct can be labeled "speech" whenever the person engaging in the conduct intends thereby to express an idea.... This Court has held that when "speech" and "nonspeech" elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms.

391 U.S. at 376, 88 S.Ct. at 1678–79.

*O'Brien* prescribed a four-part test of government regulation of expressive conduct. (1) Does the regulation lie within the constitutional power of the government? (2) Does the regulation further an important or substantial governmental interest? (3) Is the governmental interest unrelated to the suppression of free expression? (4) Is the incidental restriction of expressive freedom no greater than the furtherance of that interest requires? *Id.* at 377, 88 S.Ct. at 1679.

■ We may pass quickly through the first three portions of this test. Prostitution has long been regarded in Arizona as "an evil over which the legislature has almost plenary power...." *State v. Green,* 60 Ariz. 63, 66, 131 P.2d 411, 412 (1942). Other courts have recognized a substantial state interest in proscribing prostitution. *People v. Maita,* 157 Cal.App.3d 309, 316, 203 Cal.Rptr. 685, 688 (1984); *People v. Kovner,* 96 Misc.2d 414, 418, 409 N.Y.S.2d 349, 352 (N.Y.Sup.Ct.1978). Among the various supportive rationales are preventing communicable disease, preventing sexual exploitation, and reducing the assorted criminal misconduct that tends to cluster with prostitution. These and other reasons legitimately attributable to anti-prostitution statutes are wholly unrelated to suppressing free expression.

■ We come then to the fourth *O'Brien* question: whether the present statute's incidental impingement on First Amendment freedoms is greater than essential to further the governmental interests at stake. This question returns us to defendant's argument that protected theatrical expression will suffer if the state may prosecute erotic performance as prostitution and thereby circumvent convincing a jury that the performance was obscene.

Defendant rests this argument principally on *People v. Freeman,* 46 Cal.3d 419, 758 P.2d 1128, 250 Cal.Rptr. 598 (1988), *cert. denied,* 489 U.S. 1017, 109 S.Ct. 1133, 103 L.Ed.2d 194 (1989). There the California Supreme Court reversed the pandering conviction of a film producer who paid actors to copulate on screen. The defendant in *Freeman* was not charged with obscenity; nor did a jury find that his production was obscene. The court observed that "the self-evident purpose of the prosecuting authority in bringing ... charges [of pandering] was to prevent profiteering in *pornography* without the necessity of proving obscenity." *Id.* at 427, 758 P.2d at 1132–33, 250 Cal.Rptr. at 602. The court concluded (1) that the state must prove the film lacked First Amendment protection in order to punish the defendant for producing it; (2) that the state could only establish that the film lacked First Amendment protection by proving it obscene; and (3) that this film had not been proved—and thus could not be assumed—obscene. *Id.* at 425–26, 758 P.2d at 1131–32, 250 Cal.Rptr. at 601.

*Freeman* is considerably different from this case. The court there interpreted California's prostitution statute to require payment for the purpose of sexual arousal or gratification. *Id.* at 424, 758 P.2d at 1130, 250 Cal.Rptr. at 600. The court found no evidence that the defendant paid the actors to perform for his sexual gratification, their own, or that of other persons present. To the contrary, the actors were paid for performing in a film. *Id.* at 424, 758 P.2d at 1130–31, 250 Cal.Rptr. at 600. While the film might ultimately have induced sexual arousal or gratification in the hands of remote consumers, the performers were separated from such consumers by time and the distancing medium of film. Any question of illegal sexual arousal or gratification thus required a judgment concerning the nature of the film—a judgment indistinguishable from the question of obscenity.

Yet the *Freeman* court approved as "fundamentally distinguishable" an earlier case in which a prostitution-related conviction had been upheld without proof of obscenity where "members of the 'theater' audience [paid] for sexual conduct with the 'actors' hired by the theater owner for that purpose." *Id.* at 429–30, 758 P.2d at 1134, 250 Cal.Rptr. at 604, describing *People v. Maita*, 157 Cal.App.3d 309, 203 Cal.Rptr. 685 (1984). In the stage show considered in *Maita*, the performer stripped and fondled herself before a paying audience, then let members of the audience suck her breasts and perform cunnilingus if they chose. Finally, a male volunteer was selected from the audience for fellatio on stage and, on at least one occasion, for intercourse offstage. The defendant owner-manager was convicted of pimping, pandering, keeping a house of ill fame, and keeping a house used for prostitution.

The California Court of Appeal acknowledged that "theatrical performances have, in recent years, been afforded broad First Amendment protection," *id.* at 315, 203 Cal.Rptr. at 687, and further acknowledged

> that the state's unquestioned authority to prosecute under the pimping and pandering laws presents an incidental restriction on appellant's First Amendment freedoms. However, that restriction is no greater than is essential to further the substantial government interest in controlling prostitution. After all, the pimping and pandering laws do not prohibit the presentation of live nude entertainment—they merely direct that the entertainer cannot have sexual relations with the audience.

*Id.* at 316, 203 Cal.Rptr. at 688.

This case lies somewhere between *Freeman* and *Maita*, but considerably closer to the latter in our view. There was no film here as in *Freeman* to distance the observer temporally and physically from the performers; here the customer was temporally present, distanced only by the intervening glass. In *Freeman* the film was the commercial product, an inescapable subject of obscenity analysis. Here the commercial product was a live sex show in a setting that facilitated and explicitly encouraged masturbation.

This case resembles *Maita* in the presence of the consumer. It is more difficult than *Maita*, however, because the shows in Booth 14 were enacted for the customer as voyeur. There are few definitional difficulties in a law that prohibits charging the customers to have sex with the actors. Voyeurism, however, unlike participatory sex, is a common element of theatre, and eros is an element of human nature that theatrical producers, performers, and patrons are constitutionally at liberty to explore. Thus, there are obvious definitional and constitutional difficulties in a law that prohibits charging a customer to watch what might be an erotic or a sexually arousing show.

Those difficulties, however, are only theoretically, not practically, presented by this case. Two points here persuade us that this prosecution was constitutionally sound. First, the show in Booth 14 was not a public performance of a potentially sexually arousing type, but a semi-private performance with an explicitly masturbatory end. Second, as we have previously indicated, had a customer paid to watch defendant and another woman act identically in a private motel room, the application of A.R.S. § 13–3211(5) would be clear; that statute defines prostitution as "engaging ... in sexual conduct with another person under a fee arrangement with that person *or any other person.*" (emphasis added). The United States Supreme Court has stated:

> Conduct or depictions of conduct that the state police power can prohibit on a public street do not become automatically protected by the Constitution merely because the conduct is moved to a bar or a "live" theatre stage, any more than a "live" performance of a man and woman locked in sexual embrace at high noon in Times Square is protected by the Constitution because they simultaneously engage in a valid political dialogue.

*Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 66–67, 93 S.Ct. 2628, 2640, 37 L.Ed.2d 446 (1973).

We recognize that A.R.S. § 13–3211(5) is broadly written and might be literally applied to sexual contact of a nature that the theatre is constitutionally entitled to present. The defendant, however, has not briefed the issue as one of overbreadth. Moreover, although courts have occasionally considered a First Amendment statutory challenge by a litigant whose "conduct . . . is not constitutionally protected and clearly falls within the statute's legitimate scope," this exception to normal standing requirements is reserved for instances of "realistic danger that the statute will significantly jeopardize recognized first amendment protections of individuals not before the court." *State v. Steiger*, 162 Ariz. 138, 144, 781 P.2d 616, 622 (1989). We find no such realistic danger in this case and, therefore, leave overbreadth analysis for the case, if it ever arises, where prosecutorial discretion under A.R.S. § 13–3211(5) is abused.

## CONCLUSION

We conclude that defendant's conduct was legitimately prosecuted under Arizona's prostitution statutes, that her prosecution and conviction satisfy *O'Brien* analysis, and that, on the facts of this case, proof of obscenity was not required. The judgment and sentence of the trial court are affirmed.

GERBER, P.J., and MONTIEL, J., concur.

Note: The Honorable ROBERTO C. MONTIEL, Santa Cruz County Superior Court Judge, was authorized to participate in the disposition of this matter by the Chief Justice of the Arizona Supreme Court pursuant to Ariz. Const. art. VI, § 3.