IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

| | | |
|---|---|---|
| EMPRESS ADULT VIDEO AND BOOKSTORE, an Arizona corporation; OSCO COMMUNICATIONS GROUP, INC., an Arizona corporation, | ) ) ) ) ) | |
| Plaintiffs/Appellants, | ) ) | 2 CA-CV 2000-0079 DEPARTMENT B |
| v. | ) ) | O P I N I O N |
| CITY OF TUCSON, a municipal corporation, | ) ) ) | |
| Defendant/Appellee, | ) ) | |
| and | ) ) | |
| STATE OF ARIZONA, | ) ) | |
| Intervenor/Appellee. | ) ) | |

APPEAL FROM THE SUPERIOR COURT OF PIMA COUNTY

Cause No. 336804

Honorable Nanette M. Warner, Judge

AFFIRMED IN PART AND REVERSED IN PART

Meehan & Associates
  By Michael J. Meehan                                                    Tucson
                                              Attorneys for Plaintiffs/Appellants


Thomas J. Berning, Tucson City Attorney
  By David L. Deibel                                                      Tucson
                                              Attorneys for Defendant/Appellee


Janet Napolitano, Arizona Attorney General
  By H. Leslie Hall and Thomas J. Dennis                                 Phoenix
                                              Attorneys for Intervenor/Appellee

---

D R U K E, Presiding Judge.


¶1          Appellants Empress Adult Video and Bookstore and Osco Communications Group

(collectively, Empress) operate an adult-oriented business that principally sells and rents

nonobscene, sexually explicit materials and predominantly features nonobscene, sexually explicit

live performances.[1]  As a result, A.R.S. § 13-1422, in conjunction with A.R.S. § 11-821, requires

Empress to close between 1:00 a.m. and 8:00 a.m. from Monday through Saturday and between

1:00 a.m. and 12:00 noon on Sunday; failure to do so constitutes a class one misdemeanor.[2]

Empress sought an injunction against the enforcement of § 13-1422 and a declaratory judgment

---

[1]Appellees make no claim the materials or performances are obscene.

[2]Section 13-1422, A.R.S., applies to adult arcades, adult bookstores or video stores, adult cabarets, adult motion picture theaters, and adult theaters as well as escort agencies and nude model studios. Because Empress does not operate an escort agency or nude model studio and does not serve alcoholic beverages, the provisions of § 13-1422 that apply to such activities are not at issue here. Section 11-821, A.R.S., is part of the county planning and zoning statutes and allows for "the regulation and use of business licenses, adult oriented business manager permits and adult service provider permits in conjunction with the establishment or operation of adult oriented businesses and facilities." § 11-821(B)(5). Section 11-821(H) also provides definitions for various types of adult oriented businesses, materials, and live performances covered by § 13-1422.

2

that the statute violates article II, §§ 6 and 13 of the Arizona Constitution.[3] The trial court found that § 13-1422 does not violate our state constitution and denied injunctive relief. This appeal by Empress followed. We have jurisdiction pursuant to A.R.S. § 12-2101.

**¶2** We apply a de novo standard of review in determining a statute's constitutionality. *State v. Korzuch*, 186 Ariz. 190, 920 P.2d 312 (1996); *State v. Evenson*, 201 Ariz. 209, 33 P.3d 780 (App. 2001). Because we presume a statute is constitutional, *New Times, Inc. v. Arizona Board of Regents*, 110 Ariz. 367, 519 P.2d 169 (1974), the burden of overcoming this presumption rests on the party challenging the statute. *Kotterman v. Killian*, 193 Ariz. 273, 972 P.2d 606 (1999). "[A]nd we resolve all uncertainties in favor of constitutionality." *Id.* at ¶31. But, when constitutional rights are at issue, "we avoid, where possible, attempts to erode [those] rights by balancing them against regulations serving governmental interests." *Mountain States Tel. & Tel. Co. v. Arizona Corp. Comm'n*, 160 Ariz. 350, 357, 773 P.2d 455, 462 (1989).

### Article II, § 6

**¶3** Article II, § 6 of Arizona's Constitution provides that "[e]very person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right." Our supreme court has recognized that the scope of this provision is generally greater than that of the First Amendment to the United States Constitution. "Indeed, this court has previously given art. 2, § 6 greater scope than the first amendment." *Mountain States*, 160 Ariz. at 354, 773 P.2d at 459; *see also Phoenix Newspapers, Inc. v. Superior Court*, 101 Ariz. 257, 259, 418 P.2d 594,

---

[3]The original complaint Empress filed also claimed that § 13-1422 violated the United States Constitution. But Empress did not include that claim in its amended complaint and, on appeal, states that its "challenge to this statute is predicated solely on the Arizona Constitution."

3

596 (1966) ("The right of every person [in Arizona] to freely speak, write and publish may not be limited but such a person may be held accountable for an abuse of that right."); *Martin v. Reinstein*, 195 Ariz. 293, 987 P.2d 779 (App. 1999) (acknowledging that, in some circumstances, our constitution provides greater protection to speech than federal constitution).

¶4        Relying primarily on *Mountain States*, Empress contends the greater scope of article II, § 6 protects the nonobscene, sexually explicit materials and live performances encompassed by § 13-1422 and § 11-821. Empress points out that, in *Mountain States*, the supreme court opted for "a more literal application" of article II, § 6. 160 Ariz. at 357, 773 P.2d at 462. Appellees counter that *Mountain States* also included the caveat that it did not "deal with the problems from sexually explicit messages." 160 Ariz. at 352 n.4, 773 P.2d at 457 n.4. And, although appellees concede that article II, § 6 does provide speech "a greater degree of protection in some instances than does the First Amendment," they contend Arizona's courts have often held that article II, § 6 provides the same protection. In support, they cite *Yetman v. English*, 168 Ariz. 71, 811 P.2d 323 (1991); *Reinstein*; *Bird v. State*, 184 Ariz. 198, 908 P.2d 12 (App. 1995); *In re Maricopa County Juvenile Action No. JT9065297*, 181 Ariz. 69, 887 P.2d 599 (App. 1994); *Berry v. Foster*, 180 Ariz. 233, 883 P.2d 470 (App. 1994); and *Fiesta Mall Venture v. Mecham Recall Committee*, 159 Ariz. 371, 767 P.2d 719 (App. 1988). These cases are not controlling, however, because they did not involve, as here, nonobscene, sexually explicit materials or live performances.[4] Accordingly, we first determine whether article II, § 6 protects such materials or

---

[4]*Yetman* addressed defamatory speech; *Reinstein* concerned physician-patient communications; *Bird* pertained to an election wager; *Maricopa County No. JT9065297* involved a curfew ordinance that restricted a minor's freedom of movement; *Berry* dealt with an injunction that did not implicate article II, § 6; and *Fiesta Mall* discussed political activities on private

live performances.[5] The following principles of constitutional construction guide our determination.

¶5 The cardinal rule of constitutional construction directs us to "follow the text and the intent of the framers, where it can be ascertained." *Fain Land & Cattle Co. v. Hassell*, 163 Ariz. 587, 595, 790 P.2d 242, 250 (1990); *see also County of Apache v. Southwest Lumber Mills, Inc.*, 92 Ariz. 323, 376 P.2d 854 (1962) (governing principle of constitutional construction is to give effect to framers' intent and purpose); *S. A. v. Superior Court*, 171 Ariz. 529, 530, 831 P.2d 1297, 1298 (App. 1992) (established rule of construction requires court "to follow the constitution's text and the framers' intent, if it can be determined"). And, unless the constitution otherwise defines them, we give the words of a constitutional provision their "natural, obvious and ordinary meaning." *Southwest Lumber*, 92 Ariz. at 327, 376 P.2d at 856; *see also McElhaney Cattle Co. v. Smith*, 132 Ariz. 286, 290, 645 P.2d 801, 805 (1982) ("When the words of a constitutional provision are not defined within it, the meaning to be ascribed to the words is that which is generally understood and used by the people."). We may also consider the provision's history when attempting to determine the framers' intent. *Boswell v. Phoenix Newspapers, Inc.*,

---

property.

[5]Section 11-821(H)(2) defines adult books, magazines, periodicals, photographs, films, motion pictures, videocassettes, and slides as those "that depict or describe specific sexual activities or specific anatomical areas." Similarly, § 11-821(H)(3) defines an adult live entertainment as that which "features" either "[p]ersons who appear in a state of nudity" or "[l]ive performances that are characterized by the exposure of specific anatomical areas or specific sexual activities." In this context, "feature" means "a marked element of something: something that is esp. prominent." *Webster's Third New International Dictionary* 832 (1971).

152 Ariz. 9, 730 P.2d 186 (1986) (when necessary, court examines history of constitutional provision to determine framers' intent).

¶6         Applying the above principles to article II, § 6, we first note that it secures the right of every person in Arizona to "freely speak, write, and publish on all subjects." This language neither expressly nor implicitly excludes the subject of sex. Indeed, the ordinary meaning of the word "all" indicates otherwise. In this context, the word means "each and every one of" or "every." *Webster's Third New International Dictionary* 54 (1971). Based on the plain language of article II, § 6, then, every person in Arizona has the right to speak, write, and publish freely on every subject, from anarchy to zoology. As the supreme court observed in *Phoenix Newspapers,* the words of article II, § 6 "are too plain for equivocation." 101 Ariz. at 259, 418 P.2d at 596.

¶7         Moreover, the available history of article II, § 6 does not suggest the framers intended to limit the type of subjects that one can address. According to one legal scholar, those attending the 1910 constitutional convention "borrowed liberally from the Constitution of the State of Washington in framing the Declaration of Rights that now appears in article II." John D. Leshy, *The Making of the Arizona Constitution*, 20 Ariz. St. L.J. 1, 82 (1988). The free speech provisions in both constitutions contain identical language and, of article I, § 5 of the Washington Constitution, it has been said that it "often will support a broader protection for free speech." *State v. Reece*, 757 P.2d 947, 955 (Wash. 1988). Our research also discloses that some forty other state constitutions contain provisions with language substantially similar to article II, § 6 of

6

our state constitution.[6] For instance, article I, § 2 of the California Constitution contains almost identical language and is considered more "definitive and inclusive than the First Amendment." *Wilson v. Superior Court*, 532 P.2d 116, 120 (Cal. 1975). Likewise, "[t]he protection afforded by the guarantees of free press and speech in [article I, § 8 of] the New York Constitution is often broader than the minimum required by the First Amendment." *O'Neill v. Oakgrove Constr. Inc.*, 523 N.E.2d 277 n.3 (N.Y. 1988). Also, similar language in article I, § 8 of the Texas Constitution has been held "to ensure broad liberty of speech," *Davenport v. Garcia*, 834 S.W.2d 4, 8 (Tex. 1992), and to "clothe[] the citizen with liberty to speak, write, or publish his opinion on any and all subjects." *Ex parte Neill*, 22 S.W. 923, 924 (Tex. Crim. App. 1893). Additionally, the Oregon Supreme Court has said that the free speech provision of its constitution has greater breadth than the First Amendment and covers "verbal and nonverbal expressions contained in films, pictures, paintings, sculpture and the like" on " 'any subject whatever.'" *State v. Henry*, 732 P.2d 9, 11 (Or. 1987), *quoting* article I, § 8 of the Oregon Constitution. And, in *Lindsay & Co. v. Montana Fed'n of Labor*, 96 P. 127, 131 (Mont. 1908), the court reached this conclusion about article III, § 10 of the Montana Constitution: "That the individual citizen of Montana cannot be prevented from speaking, writing, or publishing whatever he will on any subject." We are of the same opinion on our own article II, § 6; it protects the right of each person in this state to speak, write, or publish on all manner of subjects, including sex, and to do so freely.

---

[6]*See Ex parte Tucci*, 859 S.W.2d 1 (Tex. 1993).

¶8        Although this right may be exercised freely, article II, § 6 itself makes each individual "responsible for the abuse of that right." Accordingly, a person may be answerable for defamatory statements, *see Yetman*; perjury, *see* A.R.S. § 13-2702 and *Franzi v. Superior Court*, 139 Ariz. 556, 679 P.2d 1043 (1984); uttering "fighting words," *see State v. Brahy*, 22 Ariz. App. 524, 529 P.2d 236 (1974); offering or conspiring to commit an act of prostitution, *see Files v. Bernal*, 200 Ariz. 64, 22 P.3d 57 (App. 2001); bribery, *see* A.R.S. §§ 13-2602 and 13-2605; or commercially publishing an obscene book, magazine, photograph, or motion picture. *See* A.R.S. §§ 13-3501 and 13-3502; *State ex rel. Collins v. Superior Court*, 163 Ariz. 246, 787 P.2d 1042 (1986).

¶9        Additionally, *Mountain States* makes clear that the protection afforded by article II, § 6 does not foreclose limited governmental regulation. There, the supreme court recognized that a governmental department or agency can "impose content-neutral, reasonable time, place, and manner regulations that tangentially affect speech." 160 Ariz. at 358, 773 P.2d at 463. But such regulations, said the court, "must regulate with narrow specificity so as to affect as little as possible the ability of the sender and receiver to communicate." *Id.*; *see also New Times*, 110 Ariz. at 371, 519 P.2d at 173 (restrictions on First Amendment rights "must be drawn with narrow specificity").

¶10        Empress asserts that § 13-1422 is unconstitutional under article II, § 6 because the statute fails to satisfy this narrow specificity standard. Empress contends the legislature "could have drafted restrictions that more directly address the alleged problems . . . caused by adult entertainment businesses." Appellees respond that we should determine the constitutionality of § 13-1422 under First Amendment principles, arguing that Arizona's narrow specificity standard

8

is no different from the "narrowly tailored" standard adopted by the Supreme Court.  This standard requires that "a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests."  *Ward v. Rock Against Racism*, 491 U.S. 781, 798, 109 S. Ct. 2746, 2757, 105 L. Ed. 2d 661, 680 (1989).  The regulation satisfies the federal standard if it "'promotes a substantial government interest that would be achieved less effectively absent the regulation.'"  *Id.* at 799, 109 S. Ct. at 2758, 105 L. Ed. 2d at 680, *quoting United States v. Albertini*, 472 U.S. 675, 689, 105 S. Ct. 2897, 2906, 86 L. Ed. 2d 536, 548 (1985).  The regulation "need not be the least restrictive or least intrusive means of doing so," however.  *Ward*, 491 U.S. at 798, 109 S. Ct. at 2757-58, 105 L. Ed. 2d at 680.[7]  We thus examine *Mountain States* to determine whether its narrow specificity requirement imposes a different standard.  But, because § 13-1422 regulates two different forms of protected

---

[7]Based on the federal narrowly tailored standard, a number of federal appellate courts have concluded that hours-of-operation restrictions similar to § 13-1422 do not offend the First Amendment.  *See Dima Corp. v. Town of Hallie*, 185 F.3d 823 (7th Cir. 1999) (holding that ordinance restricting adult bookstore's hours of operation survives First Amendment challenge); *Richland Bookmart, Inc. v. Nichols*, 137 F.3d 435 (6th Cir. 1998) (ruling that First Amendment not violated by statute limiting hours a business may sell adult books, magazines, and videotapes); *Ben Rich Trading, Inc. v. City of Vineland*, 126 F.3d 155 (3d Cir. 1997) (determining that ordinance regulating operating hours of establishments selling adult books and showing adult films constituted permissible time, place, and manner restriction on speech for purposes of First Amendment).

expression—nonobscene, sexually explicit materials, or "adult speech,"[8] as well as nonobscene, sexually explicit live performances, or "expressive conduct"[9]—we address the two separately.

## Adult Speech

¶11    *Mountain States* involved so-called "ScoopLines" that provided sports, weather, and other types of information, including "sexually explicit messages," through the telephone lines of Mountain States Telephone and Telegraph Company. 160 Ariz. at 352, 773 P.2d at 457. As a result of various problems and complaints about ScoopLine services, the Arizona Corporation Commission ordered the telephone company "to implement universal blocking of all ScoopLines and to propose a presubscription plan for the Commission's approval." *Id.* at 353, 773 P.2d at 458.

¶12    The telephone company sought special action relief in the supreme court, asserting, inter alia, that the Commission's presubscription order violated article II, § 6. In response, the Commission first argued that the order was a reasonable utility regulation that did not significantly affect free speech. The court disagreed, holding that "any requirement of prior subscription, even universal presubscription, adversely affects the right to speak and publish" guaranteed by article II, § 6. 160 Ariz. at 357, 773 P.2d at 462.

---

[8]*See City of Los Angeles v. Alameda Books, Inc*., 535 U.S. 425, 122 S. Ct. 1728, 152 L. Ed. 2d 670 (2002) (acknowledging that city ordinance regulating "adult" bookstores selling books and videocassettes depicting sexual activities implicates First Amendment rights); *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S. Ct. 2440, 49 L. Ed. 2d 310 (1976) (recognizing that nonobscene, sexually explicit "adult" motion pictures are protected by First Amendment).

[9]*See Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566, 111 S. Ct. 2456, 2460, 115 L. Ed. 2d 504, 511 (1991) (describing nude dancing as "expressive conduct").

¶13    The Commission also argued that its order was an allowable time, place, and manner regulation under the First Amendment. The supreme court rejected this argument as well, declaring: "Even if we agreed with the Commission's interpretation of the first amendment, Arizona's constitution does not permit the time, place, and manner regulation in question here." *Id.* As noted above, the court stated that, under article II, § 6, regulations affecting speech "must regulate with narrow specificity so as to affect *as little as possible* the ability of the sender and receiver to communicate." 160 Ariz. at 358, 773 P.2d at 463 (emphasis added). From the emphasized language, we conclude that the court adopted a different and more restrictive standard for regulations affecting speech than the federal standards enunciated in *Ward*.

¶14    Our conclusion finds support in the supreme court's application of this narrow specificity standard to the regulation at issue in *Mountain States*. The court observed that, although the Commission's "presubscription requirement might be a more convenient and certain method" of addressing the ScoopLine problems, the telephone company's proposals for self-imposed regulations illustrated other "plausible means" of doing so and thereby demonstrated "that the Commission did not choose its regulation with narrow specificity." 160 Ariz. at 358, 773 P.2d at 463. "[G]overnmental convenience and certainty," said the court, "cannot prevail over constitutionally guaranteed rights." *Id.*

¶15    We also find persuasive support for our conclusion in cases from Texas, New York, and California, jurisdictions that, as already mentioned, have constitutional free speech provisions similar to our own. *See Faires v. Frohmiller*, 49 Ariz. 366, 372, 67 P.2d 470, 472 (1937) (decisions from states with constitutional provisions similar to our own "are very persuasive"). *Davenport*, a Texas case, involved the imposition of a "gag order" similar to the

one in *Phoenix Newspapers*. Although the Texas order in *Davenport* involved counsel and the Arizona order in *Phoenix Newspapers* involved the press, the trial judges in both cases had entered orders prohibiting public comment or discussion about pending litigation. The supreme courts in both jurisdictions vacated the gag orders based on the free speech provisions of their respective constitutions. Our supreme court concluded that the order violated article II, § 6, stating that "[t]here can be no censor appointed to whom the press must apply for prior permission to publish" and citing California and Texas case law as support for that proposition. *Phoenix Newspapers*, 101 Ariz. at 259, 418 P.2d at 596. The Texas Supreme Court reached the same conclusion but did so, in part, because nothing in the gag order indicated that it was "the least restrictive means to prevent th[e] harm." *Davenport*, 834 S.W.2d at 10. The court noted that the order offered "no explanation of why [the] harm could not be sufficiently cured by remedial action" such as "sanction[ing counsel's] conduct" and commented that "'the argument of convenience can have no weight as against those safeguards of the constitution.'" *Id*. at 11, *quoting Ex parte McCormick*, 88 S.W.2d 104, 107 (Tex. Crim. App. 1935).

¶16        In the New York case of *Time Square Books, Inc. v. City of Rochester*, 645 N.Y.S.2d 951 (N.Y. App. Div. 1996), a municipal ordinance required adult businesses to have open, rather than closed, booths for viewing nonobscene, sexually explicit motion pictures. The municipality had adopted the ordinance to reduce the transmission of sexually related diseases, having found that the patrons of such businesses had used closed booths for high-risk sexual activity. On appeal, the court reversed the trial court's refusal to issue a preliminary injunction to enjoin the ordinance's enforcement, finding that the business owners had, based on "the broad degree of protection afforded free expression" by the state's constitution, "made a prima facie

12

showing of their right to relief sufficient to warrant the issuance of a preliminary injunction." *Id.* at 955. The court determined that the municipality had "failed to demonstrate that the open booth requirement . . . [was] no broader than necessary to accomplish [its] objective of preventing . . . sexually transmitted diseases." *Id.* at 956. The court found that "[l]ess restrictive alternatives . . . [were] available to serve th[e] objective" and that the municipality had "offered no evidence suggesting that those less restrictive alternatives would be any less effective in meeting the[] objective than opening the booths to public view." *Id.*; *see also People ex rel. Arcara v. Cloud Books, Inc.*, 503 N.E.2d 492 (N.Y. 1986) (in seeking to close adult book store, state had burden to show it had chosen course no broader than necessary to accomplish its purpose); *cf. Town of Islip v. Caviglia*, 542 N.Y.S.2d 139 (N.Y. 1989) (state constitution's free expression provision not violated by zoning ordinance that addressed adult uses when ordinance did not operate as prior restraint and adverse effects of such uses on neighboring properties not subject to direct attack through injunction or criminal proceedings).

¶17         And, in the California case of *People v. Glaze*, 614 P.2d 291 (Cal. 1980), the court struck down a municipal closing ordinance similar to the closing statute at issue here as violative of the state constitution.[10] The municipal ordinance required arcades showing adult motion pictures to close between the hours of 2:00 a.m. and 9:00 a.m. and had been enacted to help "prevent masturbation during those hours when law enforcement problems [were] greatest." *Id.*

_____

[10]Although *Glaze* refers generally to "First Amendment rights," the court made clear that it was considering only "whether the challenged [ordinance] is consistent with the California Constitution" but, "in keeping with convention, [referred to] the free speech rights at stake . . . as First Amendment rights." 614 P.2d at 293 n.2. We have not adopted that convention in this decision.

13

at 295. In declaring the ordinance unconstitutional under article I, § 2 of the California Constitution, the court held that the municipality had failed to meet its burden of showing "that the closing-hours-requirement [was] necessary or that it [was] the least restrictive means available to curb anticipated masturbation." *Glaze*, 614 P.2d at 296. The court pointed out that the government could address the problem directly "by arresting and prosecuting" the offenders, *id.* at 295; by requiring that "a licensed manager be present to supervise the premises," *id.* at 296; or by prohibiting "an owner from knowingly allowing lewd conduct to occur." *Id*. at 296 n. 6. The court also rejected the municipality's argument that the limited number of police available during the early morning hours made the closing-hours requirement necessary, observing that governmental "'convenience'" cannot "'restrict unnecessarily a lawful occupation,'" especially when "First Amendment rights are involved." *Id.* at 295-96, *quoting Skaggs v. City of Oakland*, 57 P.2d 478, 480 (Cal. 1936).

¶18        The trial court in this case found, based on the record before it, that the effects of adult businesses included "increased crime and sexually oriented litter" as well as "the negative effect on neighboring property values." The court also found that the primary purpose of § 13-1422 "is to regulate [those] negative secondary effects." The court further found that the statute's closing-hours requirement met "the 'narrow specificity' requirement" of *Mountain States*.

¶19        Empress does not challenge the trial court's first two findings, and the record before us reasonably supports them. Instead, Empress argues that § 13-1422 is not drawn with the requisite narrow specificity, contending the legislature could have drafted restrictions that target the negative secondary effects more directly. We agree. The legislative history shows that legislators considered testimony, letters, and surveys linking prostitution and other crimes to adult

14

businesses, but that history is devoid of any evidence or consideration about less restrictive means of dealing with those crimes, such as increased enforcement of existing criminal statutes that prohibit loitering, A.R.S. § 13-2905; prostitution, A.R.S. §§ 13-3201 through 13-3214; and criminal or public nuisances. A.R.S. §§ 13-2908 and 13-2917; *see Glaze.*

¶20 And, although legislative testimony showed increased sexually oriented litter associated with adult businesses, litter control cannot justify restrictions on freedom of expression. In *New Times,* our supreme court held unconstitutional a university regulation that limited the number of newsstands for distributing off-campus newspapers and imposed a fee for each newsstand. The only reason the university advanced for the regulation was "to limit the amount of litter resulting from the disposal of newspapers and to cover the additional cleanup costs involved." *New Times*, 110 Ariz. at 372, 519 P.2d at 174. Relying on *Schneider v. New Jersey*, 308 U.S. 147, 60 S. Ct. 146, 84 L. Ed. 155 (1939), and *Martin v. City of Struthers*, 319 U.S. 141, 63 S. Ct. 862, 87 L. Ed. 1313 (1943), the court stated that "the problem of litter control is not of sufficient importance to balance the risk of abridging First Amendment freedoms. . . . [The university] clearly has the power to regulate the conduct of those who actually cause the litter rather than the publishers of such newspapers." *New Times*, 110 Ariz. at 372, 519 P.2d at 174; *see also* A.R.S. § 13-1603 (prohibiting littering).

¶21 The record before us thus demonstrates that the closing-hours requirement of § 13-1422 provides a convenient, but not the least restrictive means, of curbing the negative effects of adult speech. Rather, the requirement bans such speech for not less than seven hours a day and, thus, during those hours, "erects a direct barrier to communication." *Mountain States*, 160 Ariz. at 358, 773 P.2d at 463. We cannot say, therefore, that § 13-1422 affects adult speech "as little

15

as possible." *Mountain States*, 160 Ariz. at 358, 773 P.2d at 463. Accordingly, although the statute may not offend the First Amendment of the United States Constitution, we hold that § 13-1422 fails to satisfy the narrow specificity requirement of *Mountain States* and, accordingly, as to adult speech, violates article II, § 6 of the Arizona Constitution.

**Expressive Conduct**

¶22 Empress contends the protection of article II, § 6 also extends to such expressive conduct as the nonobscene, sexually explicit live performances and nude dancing (collectively, nude dancing) that § 13-1422 encompasses. Empress relies on *State v. Western*, 168 Ariz. 169, 173, 812 P.2d 987, 991 (1991), in which our supreme court held that the First Amendment protects "non-obscene dancing at locations that do not serve alcohol"; *see also State v. Jones*, 177 Ariz. 94, 99, 865 P.2d 138, 143 (App. 1993) ("even nude dancing enjoys some protection" under First Amendment); *Wortham v. City of Tucson*, 128 Ariz. 137, 140, 624 P.2d 334, 337 (App. 1980) (nude or partially nude dancing "may be protected by the First Amendment"). Empress thus argues that "the more stringent protections of the Arizona Constitution should also protect such nonobscene nude dancing." We have found no Arizona case holding that article II, § 6 affords greater protection to nude dancing than does the First Amendment and, therefore, as with adult speech, we look for guidance to other state decisions construing similar constitutional provisions. *See Faires*.

¶23 Because its constitution has an identical provision, we look first to the State of Washington. *See State v. Reinhold*, 123 Ariz. 50, 597 P.2d 532 (1979) (deference accorded recent Washington cases interpreting identical provision of its state constitution); *Solana Land Co. v. Murphey*, 69 Ariz. 117, 210 P.2d 593 (1949) (opinions of Washington Supreme Court

16

peculiarly persuasive when our constitutional provision obviously copied from that state's constitution). In the case of *Ino Ino, Inc. v. City of Bellevue*, 937 P.2d 154 (Wash. 1997), the court upheld the constitutionality of a city ordinance that regulated, in part, the operational hours of adult cabarets featuring nude or sexually explicit dancing. The court determined that such expressive conduct did not warrant "application of the more protective time, place, and manner analysis developed under art. I, § 5 of the state constitution," 937 P.2d at 166, because "nude dancing 'clings to the edge of protected expression,'" *id.* at 163, *quoting JJR, Inc. v. City of Seattle*, 891 P.2d 720, 724 (Wash. 1995), and because "art. I, § 5 mentions only the right to speak, write and publish." 937 P.2d at 163. The court thus applied the federal standard enunciated in *United States v. O'Brien*, 391 U.S. 367, 88 S. Ct. 1673, 20 L. Ed. 2d 672 (1968), for determining the constitutionality of such expressive conduct as nude dancing. This standard requires that a restriction on such conduct be "no greater than is essential to the furtherance of [an important or substantial governmental interest]." *Id.* at 377, 88 S. Ct. at 1679, 20 L. Ed. 2d at 680. Based on this standard, the Washington court found the city ordinance constitutionally valid because its "restrictions on First Amendment freedoms [were] no greater than essential to the furtherance of the city's interest." *Ino*, 937 P.2d at 172.

¶24     The Colorado Supreme Court reached a similar result in *7250 Corp. v. Board of County Commissioners*, 799 P.2d 917 (Colo. 1990), which also involved an ordinance restricting live nude entertainment to certain hours of the day. There, as in *Ino*, the court applied *O'Brien* to determine the ordinance's constitutionality. After finding the restrictions were no "greater than are essential" to further "the governmental objective of preserving the character and quality of residential neighborhoods," *7250 Corp.*, 799 P.2d at 926, the court held that the ordinance did

17

not "unconstitutionally abridge the First Amendment . . . or Article II, section 10 of the Colorado Constitution."[11]  799 P.2d at 928.

¶25    Likewise, in *Tily B., Inc. v. City of Newport Beach*, 81 Cal. Rptr. 2d 6 (Ct. App. 1998), the court concluded that a city ordinance prohibiting total nudity in an adult-oriented business was constitutional under both the California and United States Constitutions. Following the Supreme Court's lead in *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 111 S. Ct. 2456, 115 L. Ed. 2d 504 (1991), the California court applied *O'Brien* and found the ordinance "content neutral, since the city [sought] to combat the secondary effects of adult businesses, not suppress expression. And, like the identical provision in *Barnes*, the 'requirement that the dancers wear at least pasties and G-strings is modest, and the bare minimum necessary to achieve the [city's] purpose.'" *Tily*, 81 Cal. Rptr. 2d at 17, *quoting Barnes*, 501 U.S. at 572, 111 S. Ct. at 2463, 115 L. Ed. 2d at 515.

¶26    To our knowledge, two other courts have applied *O'Brien* or *Barnes* to determine whether restrictions on nude dancing violated their state constitutions. In *Knudtson v. City of Coates*, 519 N.W. 2d 166, 169 (Minn. 1994), the court upheld an ordinance requiring "minimal covering of sexually explicit body parts," finding that this "curtailment of free expression [was] nominal and incidental and insufficient to cancel the public welfare concerns of the community." Similarly, the court in *Junction 615, Inc. v. Ohio Liquor Control Commission*, 732 N.E.2d 1025, 1031 (Ohio Ct. App. 1999), upheld a state restriction on public nudity in liquor establishments,

_____

[11]The relevant part of article II, § 10 of the Colorado Constitution contains language similar to our article II, § 6, providing that "every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty."

observing that it "d[id] not restrict First Amendment rights any more than necessary" and that the "free speech guarantees accorded by the Ohio Constitution are no broader than the First Amendment." [12]

¶27        Courts other than those in *Ino* and *Junction 615* have likewise equated their state free speech provisions to the First Amendment when evaluating the constitutionality of restrictions on nude dancing. The court did so in *City of Daytona Beach v. Del Percio*, 476 So. 2d 197 (Fla. 1985), when considering the constitutionality of a city ordinance prohibiting topless dancing in barrooms. After "[a]ssuming that Florida's constitutional protection of nude barroom dancing [wa]s coextensive with the federal protections," the court concluded that the city's findings, which indicated "nude dancing . . . contribute[d] to criminal activities," provided "sufficient evidence to support the [ordinance's] incidental burden on speech." *Id*. at 203-04. And, in the oft-cited case of *Bellanca v. New York State Liquor Authority*, 429 N.E.2d 765, 768 (N.Y. 1981), the court stated that, "at the very least, the guarantee of freedom of expression set forth in our State Constitution is of no lesser vitality than that set forth in the Federal Constitution." But, unlike the *Daytona Beach* court, the *Bellanca* court held that a complete ban on topless dancing in liquor establishments was unconstitutional because there had been "no legislative findings" warranting the conclusion that the "ban is sufficiently functionally related to the exercise of the State's police power." *Bellanca*, 429 N.E.2d at 769. The court in *City of Billings v. Laedeke*, 805 P.2d 1348, 1352 (Mont. 1991), however, adopted the analysis in *Daytona Beach* and concluded its state

---

[12]*Cf. Harris v. Entertainment Sys., Inc.*, 386 S.E.2d 140 (Ga. 1989) (determining that statute prohibiting nudity in barrooms also applied to other establishments and, thus, holding, apparently under *O'Brien*, that statute substantially infringed on other protected expression).

19

constitution provided no "greater state protection of nude and semi-nude dancing . . . than what is afforded by the United States Constitution." The court thus upheld a city ordinance prohibiting nude dancing as "constitutionally sound under the Montana Constitution." *Billings*, 805 P.2d at 1352.

¶28 We have found but one jurisdiction that has decided its state constitution provides greater protection to nude dancing than the First Amendment. In *Commonwealth v. Sees*, 373 N.E.2d 1151 (Mass. 1978), the court held that a city ordinance prohibiting such dancing in a licensed liquor establishment was not facially unconstitutional under article 16 of the Massachusetts Declaration of Rights but was unconstitutional as applied.[13] The court observed that article 16 drew "no distinction between free speech in a bar and free speech on a stage" and noted that the dancer in question had performed "on a dance floor for the entertainment of patrons," had "not mingle[d] with other employees or with patrons," and "there [was] no contention that the performance was obscene." *Id.* at 1155-56. Accordingly, the court concluded that, "[a]s applied to the defendant [dancer], the ordinance violate[d] art. 16." *Id.* at 1156; *see also Cabaret Enters., Inc. v. Alcoholic Beverages Control Comm'n*, 468 N.E.2d 612 (Mass. 1984) (applying *Sees*).

¶29 Having considered the above cases and their rationale, we find more persuasive those that have concluded, either expressly or implicitly, that the free speech provisions of their state constitutions give nude dancing equivalent but no greater protection than that afforded by the First Amendment and, therefore, reach the same conclusion about article II, § 6 of the Arizona

---

[13]Article 16 simply states: "The right of free speech shall not be abridged."

Constitution. As additional support for our conclusion, we note that, before the framers adopted article II, § 6 at the 1910 constitutional convention, it was a misdemeanor for any person to willfully and lewdly expose "his person or the private parts thereof, in any public place." Rev. Stat. Ariz. Terr. Penal Code § 283 (1901). Because the framers were presumably aware of existing law, we may reasonably infer that they did not intend nude dancing to have the same broad protection that they had expressly provided the other forms of expression enumerated in article II, § 6. We also note that the territorial prohibition against public nudity, although renumbered, remained unchanged after Arizona achieved statehood in 1912. Rev. Stat. Ariz. Penal Code § 313 (1913).

¶30    Thus, as applied to such expressive conduct as nude dancing, we determine the constitutionality of § 13-1422 under the First Amendment, deeming its protections equivalent to those provided under article II, § 6 of our state constitution. Under the First Amendment, a governmental regulation of such expressive conduct is constitutional if the regulation

> is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*O'Brien*, 391 U.S. at 377, 88 S. Ct. at 1679, 20 L. Ed. 2d at 680.[14] Using this four-part test, the Supreme Court has twice found nude dancing regulations constitutional. In the first case, *Barnes*,

---

[14]Arizona's courts have applied *O'Brien* in determining whether the First Amendment protects such forms of allegedly expressive conduct as wearing a peace officer's insignia, *State v. McLamb*, 188 Ariz. 1, 932 P.2d 266 (App. 1996); wagering on elections, *Bird v. State*, 184 Ariz. 198, 908 P.2d 12 (App. 1995); and committing prostitution by performing a sex show with another person for compensation. *State v. Taylor*, 167 Ariz. 429, 808 P.2d 314 (App. 1990).

an Indiana statute required that nightclub dancers wear "pasties" and "G-strings." In upholding the statute, the Court found that its enactment was "clearly within the constitutional power of the State," 501 U.S. at 567, 111 S. Ct. at 2461, 115 L. Ed. 2d at 512; that the statute furthered "a substantial government interest in protecting order and morality," *id.* at 569, 111 S. Ct. at 2462, 115 L. Ed. 2d at 513; that this interest was "unrelated to the suppression of free expression," *id.* at 570, 111 S. Ct. at 2462, 115 L. Ed. 2d at 513; and that the statute's clothing requirement was narrowly tailored, being "the bare minimum necessary to achieve the State's purpose." *Id.* at 572, 111 S. Ct. at 2463, 115 L. Ed. 2d at 515.

¶31 Some nine years later in *City of Erie v. Pap's A.M.*, 529 U.S. 277, 120 S. Ct. 1382, 146 L. Ed. 2d 265 (2000), the Court examined a city ordinance almost identical to the Indiana statute and decided that the ordinance also satisfied *O'Brien*'s four-part test. In doing so, the Court addressed the issue of whether the ordinance targeted a form of expression (nude dancing) and was thus content based, requiring a strict scrutiny standard, or banned only conduct (nudity) and was thus content neutral, requiring *O'Brien*'s less stringent standard. Empress raises the same issue here about § 13-1422, claiming the statute is content based and quoting, in support, the following from Justice White's dissent in *Barnes*: "It is only because nude dancing performances may generate emotions and feelings of eroticism and sensuality among the spectators that the State seeks to regulate such expressive activity." 501 U.S. at 592, 111 S. Ct. at 2474, 115 L. Ed. 2d at 528 (White, J., dissenting). But, as it had in *Barnes*, the Court in *Erie* rejected Justice White's view, finding that the city council had adopted the regulation to reduce the negative secondary effects associated with live nude entertainment and, thus, concluding that "Erie's asserted interest in combating . . . [those] effects . . . [wa]s unrelated to the suppression

22

of the erotic message conveyed by nude dancing." 529 U.S. at 296, 120 S. Ct. at 1394, 146 L. Ed. 2d at 282.

¶32 For the same reason, we likewise reject Empress's claim that § 13-1422 is content based. As noted above, the trial court found, and Empress does not dispute, that the legislature enacted § 13-1422 primarily to address such negative secondary effects as increased crime, sexually oriented litter, and declining property values. Hence, under *Erie*, the legislature's "interest in preventing [these] harmful secondary effects is not related to the suppression of expression." 529 U.S. at 293, 120 S. Ct. at 1393, 146 L. Ed. 2d at 281. Empress asserts, however, that the legislative record shows that some legislators had an improper moral motive for enacting § 13-1422. Rejecting a similar claim in *Erie*, the Court stated, "[We] will not strike down an otherwise constitutional statute on the basis of an alleged illicit motive." 529 U.S. at 292, 120 S. Ct. at 1392, 146 L. Ed. 2d at 280. Accordingly, as in *Erie*, we conclude that § 13-1422 is content neutral as applied to nude dancing.

¶33 After concluding the Erie ordinance was content neutral, the Supreme Court examined *O'Brien*'s three remaining factors for determining the ordinance's constitutionality. In determining it was constitutional, the Court found that the city's "efforts to protect public health and safety are clearly within [its] police powers," *Erie*, 529 U.S. at 296, 120 S. Ct. at 1395, 146 L. Ed. 2d at 283; that the ordinance furthered an important governmental interest of "combating the harmful secondary effects associated with nude dancing," *id.*; and that "the restriction [wa]s no greater than [wa]s essential to the furtherance of the government interest." *Id.* at 301, 120 S. Ct. at 1397, 146 L. Ed. 2d at 286.

23

¶34    Similarly, upon examining the same three factors, we find that our legislature has the power to enact laws protecting the public health and safety, that § 13-1422 furthers an important governmental interest by addressing the negative secondary effects related to nude dancing, and that the statute's closing-hours requirement is no greater than necessary to further the governmental interest; it need not be the least restrictive. *See Ward.* As appellees point out, § 13-1422 allows 5,980 hours of nude dancing annually—seventeen hours daily from Monday through Saturday and thirteen hours on Sunday. *See Schultz v. City of Cumberland*, 228 F.3d 831 (7th Cir. 2000) (upholding a more restrictive ordinance requiring nonalcoholic bars featuring nude dancing to close from midnight to 10:00 a.m. Monday through Saturday and all day Sunday); *cf. Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1365 (11th Cir. 1999) (holding constitutional ordinance that required adult establishments featuring nude dancing to close from 2:00 a.m. until noon each day, finding ordinance "narrowly tailored" and afforded "reasonable alternative avenues of expression . . . [because] adult businesses [could] stay open fourteen hours a day, seven days a week"). Accordingly, we hold that, as applied to such expressive conduct as nude dancing, § 13-1422 is constitutionally valid under the First Amendment and, thus, under article II, § 6.

## Article II, § 13

¶35    Empress also challenges the constitutionality of § 13-1422 under article II, § 13 of the Arizona Constitution. Because we have already held that the statute's application to adult speech renders it constitutionally invalid under article II, § 6, we need not address whether that application likewise renders § 13-1422 unconstitutional under article II, § 13. Consequently, we

address only whether the statute's application to nude dancing violates article II, § 13, the equal protection provision of our state constitution.

¶36     Article II, § 13 provides that "[n]o law shall be enacted granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations."  This state provision has the same effect as the Equal Protection Clause of the Federal Constitution.  *Phoenix Newspapers, Inc. v. Purcell*, 187 Ariz. 74, 927 P.2d 340 (App. 1996).  Relying on *Elliott v. State*, 29 Ariz. 389, 242 P. 340 (1926), Empress contends § 13-1422 violates article II, § 13 because "adult oriented business[es] are the only businesses barred from being open during evening and Sunday morning hours, while all other businesses are allowed to be carried on freely."  Empress misreads *Elliott*. Although the court there struck down a so-called Sunday closing law that required certain businesses to close on Sunday but allowed other similar businesses to remain open that day, the court declared the law unconstitutional under article II, § 13 because it prohibited "the exercise of certain particular occupations, legitimate and laudable in themselves, while allowing other businesses, not reasonably to be distinguished from those prohibited, to be carried on freely." *Elliott*, 29 Ariz. at 395, 242 P. at 341-42.  In other words, said the court, the law granted "special privileges and immunities to certain classes of citizens of the state, while, without legal excuse, denying them to others."  *Id.* at 397, 242 P. at 342.

¶37     Here, however, few would disagree that establishments featuring nude dancing are reasonably and readily distinguished from those that do not.  But the fact that § 13-1422 treats nude dancing establishments differently does not mean that it denies equal protection and violates article II, § 13.  *See Arizona Downs v. Arizona Horsemen's Found.*, 130 Ariz. 550, 637 P.2d

25

1053 (1981) (not unconstitutional to treat different classes in varying ways); *Reinstein* (equal protection provisions do not prohibit all classifications). Whether a statute denies equal protection "depends on its character, the individuals affected, and the asserted government purpose." *Big D Constr. Corp. v. Court of Appeals*, 163 Ariz. 560, 566, 789 P.2d 1061, 1067 (1990).

¶38 We usually apply one of two tests to evaluate a challenged statutory classification: a strict scrutiny test if the statute affects a suspect class or limits a fundamental right and a rational basis test if it does not. *Id.*; *Kenyon v. Hammer*, 142 Ariz. 69, 688 P.2d 961 (1984); *Eller Media Co. v. City of Tucson*, 198 Ariz. 127, 7 P.3d 136 (App. 2000). Empress does not assert that § 13-1422 affects a suspect class, such as gender or race, and we disagree with Empress's argument that the statute limits a fundamental right. "A 'fundamental right' has generally been defined as a right 'explicitly or implicitly guaranteed by the constitution.'" *Kenyon*, 142 Ariz. at 83, 688 P.2d at 975, *quoting San Antonio Indep. Sch. Dist. v. Rodriquez*, 411 U.S. 1, 33, 93 S. Ct. 1278, 1297, 36 L. Ed. 2d 16, 43 (1973); *see State v. Watson*, 198 Ariz. 48, 6 P.3d 752 (App. 2000) (right "fundamental" if firmly rooted in country's history and tradition). Although our state and federal constitutions guarantee free expression, the Supreme Court has made clear that "nude dancing of the type at issue here is expressive conduct . . . that falls only within the outer ambit of the First Amendment's protection." *Erie*, 529 U.S. at 289, 120 S. Ct. at 1391, 146 L. Ed. 2d at 278; *see Barnes* (nude dancing within outer perimeters of First Amendment, though marginally so). Consequently, if a legislative regulation is content neutral, as we have already found § 13-1422 to be, "then the regulation need only satisfy the 'less stringent' standard from *O'Brien* for evaluating restrictions on symbolic speech." *Erie*, 529 U.S. at 289, 120 S. Ct. at 1391, 146

26

L. Ed. 2d at 278. We thus apply the rational basis test to evaluate the classification created by § 13-1422.

¶39 Under the rational basis test, a legislative enactment "must be rationally and reasonably related to furthering some legitimate governmental interest." *Big D*, 163 Ariz. at 566, 789 P.2d at 1067; *see City of Tucson v. Wolfe*, 185 Ariz. 563, 917 P.2d 706 (App. 1995) (ordinance must serve important governmental objective). In other words, "[t]he guarantee of equal protection is violated only if a classification rests on grounds wholly irrelevant to the achievement of the state's objective." *Eller*, 198 Ariz. 127, ¶9, 7 P.3d 136, ¶9. Moreover, the party challenging the statute has the burden of establishing that it is arbitrary or irrational. *See Reinstein*, 195 Ariz. 293, ¶52, 987 P.2d 779, ¶52 (party challenging constitutionality of statute has burden of establishing that there is "no conceivable basis" for it); *Purcell* (same). Empress, however, has neither argued nor established that here. Furthermore, as noted above, the legislature enacted § 13-1422 to curb the negative secondary effects associated with nude dancing establishments, and that, in our opinion, constitutes a legitimate purpose for the statute. *See City of Tucson v. Grezaffi*, 200 Ariz. 130, 23 P.3d 675 (App. 2001) (smoking ordinance reasonable, legitimate means of safeguarding community's health, safety, and welfare).

¶40 The rational basis test next requires that we "determine if it is reasonable to believe that the classification will promote that purpose." *Big D*, 163 Ariz. at 566, 789 P.2d at 1067; *see Eller* (under rational basis test, law upheld if facts support conclusion that classification rationally furthers legitimate state interest). Based on the record before us, we reasonably believe that the closing-hours requirement of § 13-1422 will promote its stated purpose. "A perfect fit is not required; a statute that has a rational basis will not be overturned 'merely because it is not made

with "mathematical nicety, or because in practice it results in some inequality." '" *Big D*, 163 Ariz. at 566, 789 P.2d at 1067, *quoting Bryant v. Continental Conveyor & Equip. Co.* 156 Ariz. 193, 197, 751 P.2d 509, 513 (1988), *quoting Uhlmann v. Wren*, 97 Ariz. 366, 388, 401 P.2d 113, 128 (1965); *see State v. Hammonds*, 192 Ariz. 528, ¶11, 968 P.2d 601, ¶11 (App. 1998) (legislature not required to forego measure "simply because it may be somewhat imprecise"). Accordingly, as applied to nude dancing, § 13-1422 does not violate article II, § 13 of the Arizona Constitution.

**Severance**

¶41        Because we have declared § 13-1422 constitutionally invalid as applied to adult speech but constitutionally valid as applied to nude dancing, we must determine whether the valid portion can be severed from the invalid portion. "An entire statute need not be declared unconstitutional if constitutional portions can be separated." *Republic Inv. Fund I v. Town of Surprise,* 166 Ariz. 143, 151, 800 P.2d 1251, 1259 (1990); *see State v. Prentiss*, 163 Ariz. 81, 786 P.2d 932 (1989) (court should not declare entire statute unconstitutional if constitutional and unconstitutional portions can be severed). "The test for severability requires ascertaining legislative intent." *Republic*, 166 Ariz. at 151, 800 P.2d at 1259. But, "if there is no clear record of legislative objective and intent, the most reliable evidence of that intent is the language of the statute." *Prentiss*, 163 Ariz. at 86, 786 P.2d at 937.

¶42        The supreme court established the following test for severability in *Selective Life Insurance Co. v. Equitable Life Assurance Society*, 101 Ariz. 594, 599, 422 P.2d 710, 715 (1967):

> [W]here the valid parts of a statute are effective and enforceable standing alone and independent of those portions declared unconstitutional, the court will not disturb the valid law if the valid

28

and invalid portions are not so intimately connected as to raise the presumption the legislature would not have enacted one without the other, and the invalid portion was not the inducement of the act.

Applying this test to the adult establishments listed in § 13-1422, and utilizing the specific definitions of those establishments in § 11-821, we find that the valid and invalid portions of § 13-1422 are not so connected and interdependent that the valid portion cannot stand alone.

¶43        Section 13-1422 lists the following adult establishments at issue here: adult arcade, adult bookstore or video store, adult motion picture theater, and adult theater.[15]  But, as defined in § 11-821(H)(9), only an adult theater features nude dancing, that is, "persons who appear in a state of nudity or who engage in live performances that are characterized by the exposure of specific anatomical areas or specific sexual activities."  By definition, none of the other establishments features nude dancing.  An adult bookstore or video store sells or rents such items as sexually explicit books, magazines, periodicals, photographs, films, motion pictures, and videocassettes, § 11-821(H)(2), and an adult arcade or adult movie theater allows the viewing of sexually explicit motion pictures, films, videocassettes, or images. § 11-821(H)(1) and (4). Thus, if we strike adult arcade, adult bookstore or video store, and adult motion picture theater from § 13-1422, the invalid portions pertaining to adult speech, we leave adult theater, the valid portion pertaining to nude dancing.  This neither strips meaning from the remainder of the statute nor renders it logically incomplete.  The invalid portions are, therefore, severable from the remainder of § 13-1422, and the remaining valid portion remains in force.

_____

[15]Although § 13-1422 also lists adult cabaret, escort agency, and nude model studio, this decision has no application to such establishments.  As stated in footnote two, Empress does not operate as an escort agency or nude model studio and, because Empress does not serve alcoholic beverages, it is not an adult cabaret, as defined in § 13-1422(D)(3).

## Conclusion

¶44     For the foregoing reasons, we hold that the application of § 13-1422 to an adult theater, as defined in § 11-821, does not violate article II, § 6 or § 13 of the Arizona Constitution. We further hold, however, that the application of § 13-1422 to an adult arcade, adult bookstore or video store, and adult motion picture theater, as they are defined in § 11-821, does violate article II, § 6 of our constitution. The closing-hours requirement of § 13-1422 is thus valid and enforceable as applied to an adult theater and invalid and unenforceable as applied to an adult arcade, adult bookstore or video store, and adult motion picture theater. Accordingly, as to the valid, enforceable application of § 13-1422, we affirm the trial court's granting of declaratory judgment in favor of appellees and denying injunctive relief to Empress. But, as to the invalid, unenforceable application of the statute, we reverse the trial court and direct that it enter declaratory judgment and injunctive relief in favor of Empress.

_____
WILLIAM E. DRUKE, Presiding Judge

CONCURRING:


_____
JOSEPH W. HOWARD, Judge


E S P I N O S A, Chief Judge, dissenting in part, concurring in part.

30

I respectfully dissent from the first portion of the opinion dealing with "adult speech" because I find no error in the trial court's determination that § 13-1422 comports with the requirements of article II, § 6 of the Arizona Constitution and *Mountain States,* to the extent that opinion may apply to the facts of this case.  I concur in the remainder of the opinion.

_____
PHILIP G. ESPINOSA, Chief Judge